**MOTOR BOAT SALES, Inc., v. PARKER, Deputy Commissioner, et al.**

No. 4693.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1941.

Before PARKER and DOBIE, Circuit Judges, and CHESTNUT, District Judge.

M. J. Fulton, of Richmond, Va., for appellant.

Robert R. Parrish, of Richmond, Va., and Harry H. Holt, Jr., Sp. Asst. to U. S. Atty., of Norfolk, Va. (Sterling Hutcheson, U. S. Atty., John V. Cogbill, Asst. U. S. Atty., T. C. Gordon, Jr., and Parrish, Butcher & Parrish, all of Richmond, Va., on the brief), for appellees.

DOBIE, Circuit Judge.

George Armistead, Jr. (hereinafter called Armistead), an employee of Motor Boat Sales, Incorporated (hereinafter called the Boat Corporation), was drowned, when a motor boat in which he was riding was overturned on the James River. Armistead's widow and minor children filed a claim against the Boat Corporation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, hereinafter called the Act. E. V. Parker, Deputy Commissioner for the Fifth Compensation District of the United States Employees' Compensation Commission (hereinafter called the Deputy Commissioner), made an award in favor of the claimants and against the Boat Corporation. Thereupon, the Boat Corporation instituted an action, under the terms of the Act, in the United States District Court for the Eastern District of Virginia, to review, set aside and enjoin the Deputy Commissioner's award. The District Court, by a final decree, sustained the award of the Deputy Commissioner and dismissed the Boat Corporation's complaint. This appeal was duly taken from that decree.

Armistead was employed by the Boat Corporation as a janitor, porter or handyman at its store, No. 3 West Grace Street, in the City of Richmond, Virginia. His duties appear to have been of the general character usually involved in such a job. He had no specialized knowledge about boats or motors. The Boat Corporation was engaged in selling small boats, outboard motors and maritime supplies needed in the types of boats it sold. The Boat Corporation did not service boats and did not do repair work on boats, engines or motors upon navigable waters. The boats it sold were fully equipped and ready for service. Unlike the situation as to automobiles, it was not customary for the Boat Corporation to demonstrate on navi-

gable waters the boats that it had for sale; for, in this type of business, it seems that a boat, when once placed in the water and run, becomes, for trade purposes, a second-hand boat. On occasions, employees were sent, in the performance of their duties, upon navigable waters, but these occasions were rather few and somewhat far-between. The testimony is clear that Armistead had been repeatedly and specifically cautioned and instructed that he was not to get on boats, ride in boats, or perform any services on navigable waters.

On August 8, 1938, the day on which Armistead was drowned, a Mr. Crown and his brother came by the store of the Boat Corporation, with a fifteen-foot row boat. The Crowns talked with Mr. Hobbs and Mr. Lloyd, Assistant Managers of the Boat Corporation, about the purchase of a second-hand outboard motor for this boat, and two particular motors were examined by the Crowns, with the idea that one of these might be purchased. It was decided that these two motors would be sent down to the James River to be attached to the boat and to be tested and operated. Both Johnnie Cooper (hereinafter called Cooper), a mechanic's helper of the Boat Corporation, and Armistead went with the motors.

The testimony is not altogether clear as to just what instructions were given by the officers of the Boat Corporation as to Armistead's duties. It seems, though, that these instructions contemplated that Armistead was to go along as a strong-arm man to help lift the motors from the car to the boat on the river and, after the motors had been tested, to help in lifting the motors back from the boat to the car. It would, of course, have been the mark of wisdom for the officers of the Boat Corporation to caution Armistead, then and there, against going out on the James River in the boat. This was not done. These officers testified, however, that though they said nothing on this particular occasion about Armistead going out on the river in the boat, Armistead had been previously given specific warning against going out on boats; and that they, therefore, fully contemplated that he would not go out on the river in the boat, but would stay on shore and limit his activities solely to such efforts as were necessary to carry the motors to and from the boat. The testimony shows that Armistead had never before been sent by the Boat Corporation on any work that might take him upon navigable waters. There was testimony that Armistead had once acted as watchman on a boat; but this was an undertaking completely on his own, outside of his hours of work and not on behalf of the Boat Corporation.

When the party, on the day in question, reached the shore of the James River, one of the outboard motors was, with the assistance of Armistead, attached to the boat and a trip on the James River was begun. Armistead got in the boat with the others and made this trip. No one either specifically told him to go in the boat or impliedly encouraged him to do so. However, it is equally clear that before he got in the boat, no one told him not to get in, and that, after he had taken his place, no one told him to get out of the boat.

After this first trip was completed, when one of the outboard motors had been tested on the boat, the two Crowns stated that they had an engagement and left. Thereupon, with Armistead's aid, the first outboard motor was removed from the boat and the second outboard motor was attached. Armistead again got in the boat and the ill-fated second trip was begun. Cooper occupied the stern of the boat, operating and navigating the boat, while Armistead sat in the bow. On this second trip, again Armistead was not asked to get in the boat; again no one forbade him to get in, and no one later asked him to get out of, the boat. Cooper testified that he gave Armistead no instructions as to any duty that Armistead was to perform on his ill-fated trip; but Cooper testified further that Armistead did act as lookout on this trip. The boat struck some obstruction, was capsized, and Armistead was drowned.

Some questions of administrative procedure under the Act are involved in this appeal. We shall confine ourselves, however, to a discussion of the single question of whether or not Armistead's employment brought him within the ambit of the Act. As to that inquiry, we think that the answer must be in the negative and that, in the light of this answer, the judgment of the District Court must be reversed.

█ The federal Longshoremen's and Harbor Workers' Act of 1927 was enacted, with the New York State Com-

pensation Act as a model, to set up a compensation scheme for injury or death on navigable waters, provided that no recovery could be had under state laws, by reason of the maritime character of the employment of the person who was killed or injured. The history of the Act is outlined by Chief Justice Hughes in Nogueira v. New York, etc., Ry. Co., 281 U.S. 128, at page 136, 50 S.Ct. 303, at page 375, 74 L.Ed. 754; while many of its provisions are sketched by the Chief Justice in the leading case of Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598. The Act is admirably discussed, with ample citation of authorities, in Robinson on Admiralty, pages 109–133. As we interpret the Act, it was designed to cover a gap between the real seamen and sailors—"seafaring men with sad, sea-weary eyes"—on the one hand, and the landlubbers, whose labors never took them upon the bounding deep, on the other hand. Between these two classes was a large group of laborers whose tasks have been called amphibious—a part of their work was on the land, another part was on navigable waters. These were the longshoremen and harbor workers. For them a federal compensation act seemed fair; so Congress enacted this statute.

The Act applies "only if the disability or death results from an injury occurring upon the navigable waters of the United States" Act, Section 3(a). There seems to be no question that this requisite was completely fulfilled in the instant case. Clearly, too, the employer-employee relation, another requisite of liability, existed between Armistead and the Boat Corporation at the time of Armistead's death.

■ This same section of the Act also permits recovery under the Act "if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law". And under Section 2(4), we find: "The term 'employer' means an employer, any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States". Sections 2 and 3 of the Act are the nub of this case. "Maritime employment" under the Act excludes matters that are purely "local". Thus, in 2 C.J.S., Admiralty, § 62, at page 132, we find: "Under federal compensation act, providing that compensation shall be payable only if recovery may not validly be provided by state law, an injury received in an employment, although maritime, pertaining to local matters and having only an incidental relation to navigation and commerce, is subject to the application of the local compensation act and without the scope of the federal act."

■ It is not necessary here for us to discuss in detail the well-known hair-line that divides the federal admiralty jurisdiction, on the one hand, from the purely local jurisdiction of the states, on the other hand. Landmarks in this field are Southern Pacific Co. v. Jensen, 244 U.S. 205. 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Chelentis v. Luchenbach Steamship Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145; Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321, 25 A.L.R. 1008; Great Lakes Dredge & Dock Co. v. Kierejewski, 261 U.S. 479, 43 S.Ct. 418, 67 L.Ed. 756. We are here concerned with the difficult problem of a specific statutory application of the general rule. Was Armistead engaged in maritime employment at the time of his death so that a recovery may be had under the Act? Or was his employment not "so directly connected with navigation and commerce that to permit the rights of the parties to be controlled by the local law would interfere with the essential uniformity of the general maritime law"? Alaska Packers' Ass'n v. Industrial Accident Comm., 276 U.S. 467, 469, 48 S.Ct. 346, 72 L.Ed. 656.

We are forced to the conclusion that Armistead's employment at the time of his death was strictly local and thus was without the scope of the Act. Though it is by no means conclusive, we think the title of the Act (Longshoremen's and Harbor Workers' Act) is very informative on our problem. Here is a janitor in a city store, who has been forbidden to go out on boats in navigable waters. To call him a harbor worker or a longshoreman would seem to be a misnomer. When he was sent by his employer on the day of his death to the shore of the James River, this, as far as the record discloses, was the only instance when his duties ever brought him into contact with navigable waters.

■ Counsel for Armistead laid great stress on the fact that Armistead was a colored man, sent to help a white man; that when Armistead took his place in the boat on the first trip, without any objection

from Cooper, and when he again, without objection from Cooper, took his place in the boat for the tragic second trip, this extended the scope of his employment; and that, as a result, Armistead, during the second trip, was actually engaged in maritime employment, as that term is used in the Act. In other connections, and for other purposes, there may well be real force in this argument. Yet, when it is remembered that Armistead had been expressly forbidden by his employers to go on navigable waters in boats, we do not think that Cooper's passive acquiescence (if such it be) has sufficient legal force to bring the death of Armistead under the beneficent terms and scope of the Act. His activities, we believe, were still local, and the control of these activities by state law works no material prejudice to the general maritime law which, in turn, is enforced as a matter of federal concern by the federal courts. We think "the employment * * * pertains to local matters, having only an incidental relation to navigation and commerce." Associate Justice VanDevanter, in Sultan Ry. & Timber Co. v. Department of Labor, etc., 277 U.S. 135, 48 S.Ct. 505, 506, 72 L.Ed. 820.

It should be noted here that compensation is payable under the Act if, for the injury or death, a recovery "may not validly be provided by State law". Act, Section 3(a). It is not necessary for the exclusion of the operation of the federal Act that a recovery should be actually available under a state compensation act. This is clearly brought out by the opinion of Circuit Judge Soper in United States Casualty Co. v. Taylor, 4 Cir., 64 F.2d 521, certiorari denied, 290 U.S. 639, 54 S.Ct. 56, 78 L.Ed. 555. The Boat Corporation in our case was not subject to the Virginia Workmen's Compensation Act, because it did not employ the minimum number of employees to bring it under the Virginia statute; but we think that Armistead's employment was so local in character that had the Boat Corporation employed the required number of employees, an action could have been brought under the state statute, and that is determinative. If the state statute can apply, the federal statute cannot.

The cases under the Act defining its scope and application are literally legion. Many of these cases will be found in the state courts, when an attempt was made to bring the injury or death within the provisions of the compensation act of the state in question. These cases, of course, are not all consistent. We think, however, that the cases have worked out a fairly well-defined theory and philosophy of the Act; and, further, we believe, that under this theory and philosophy of the Act, our decision fits with the holdings in the great majority of these cases. These cases do not prick out a clear and clean-cut line of demarcation between maritime employment and employment that is purely local; yet the cases do furnish valuable guides in a field in which we must proceed largely upon intuitions grounded in experience. We shall now proceed to discuss some of the more important of these cases. It is manifestly impracticable even to cite all of them.

First, we shall consider the cases in which the employment was held to be maritime, not local. One of the best considered opinions in all the books, fortified by an ample citation and discussion of the authorities, is St. John v. Thompson, 108 Vt. 66, 182 A. 196, and note in (1936) 22 Va. Law Rev. 822. St. John was employed to go with his employers to a summer resort on Lake Champlain, where he was to work on land, and was also to do what was required of him with regard to a motor boat that was to be operated on Lake Champlain. The motor boat became disabled on Lake Champlain and a row boat was procured and moored to the motor boat. In some way, this mooring was unloosened and the row boat drifted away from the motor boat. St. John dove overboard, in an attempt to retrieve the row boat, and was drowned. The Vermont court held that St. John's employment was maritime and that he could not recover under the Vermont Workmen's Compensation Act. It was expressly stated in this case that since the accident happened on navigable waters, the mere fact that the major portion of St. John's employment was upon land was unimportant; but this was only following Northern Coal & Dock Co. v. Strand, 278 U.S. 142, 49 S.Ct. 88, 73 L.Ed. 232. This leading case, we think, can easily be distinguished from our case. An appreciable part of St. John's employment must necessarily have been on navigable waters in the motor boat. In the instant case, however, Armistead was hired as a janitor and cautioned never to go on navigable waters.

The employment was held to be maritime in Mangieri v. Stephens, 232 N.Y. 596, 134 N.E. 586, where the employee was a laborer for a wholesale coal dealer and he

slipped and fell into the water while he was pulling a coal-boat to the dock. The same result was reached in Doey v. Clarence P. Howland Co., 224 N.Y. 30, 120 N.E. 53, when a carpenter was hurt while making repairs on a steamship; and in Keator v. Rock Plaster Mfg. Co., 224 N.Y. 540, 120 N.E. 56, certiorari denied, State Industrial Comm. v. Rock Plaster Mfg. Co., 248 U.S. 574, 39 S.Ct. 12, 63 L.Ed. 428, when an employee was injured while unloading rock from a vessel. There were like holdings in Wheeler Shipyard v. Lowe, D.C., 13 F. Supp. 863, where an employee, a painter and utility man in a shipyard company, was drowned while delivering a motor boat to a customer; in Buren v. Southern Pacific Co., 9 Cir., 50 F.2d 407, when a brakeman was injured while unloosing brakes upon a train which was being ferried across navigable waters; and, also, in Wood Towing Corp. v. Parker, 4 Cir., 76 F.2d 770, when the employee, a carpenter and general utility man for a company which operated tugs and barges, was injured while installing an engine on a motor boat purchased by the employer. Even repairing a completed vessel upon navigable waters has been held to be maritime. Robins Dry Dock Co. v. Dahl, 266 U.S. 449, 45 S.Ct. 157, 69 L.Ed. 372; John Baizley Iron Works v. Span, 281 U.S. 222, 50 S.Ct. 306, 74 L.Ed. 819.

In Independence Indemnity Co. v. Mansfield, Tex.Civ.App.1928, 2 S.W.2d 547, the employee was cleaning oil tanks on a vessel and this was held to be maritime, even though the general employment of the employee was non-maritime. A similar result was reached in United States Fidelity & Guaranty Co. v. Lawson, D.C., 15 F.Supp. 116, when the employee, a carpenter employed by an oil company for such work as he might be called on to do, was injured while he was enlarging the cabin of the private yacht of the president of the company that employed him.

Two other interesting border-line cases, in which the employment was held to be maritime, are worthy of note. In Norton v. Gulf Refining Co., 3 Cir., 94 F.2d 380, the employee was an oil gauger who had entered on a barge to take samples of her oil cargo. In Moore Dry Dock Co. v. Pillsbury, 9 Cir., 100 F.2d 245, the employee was a rigger who ate and slept at home but worked on a launch on which he lost his life.

Now for the cases in which the employment was held to be local rather than maritime. Fairly close to the instant case is Johnson v. Swonder, 84 Ind.App. 155, 150 N.E. 615, 616, in which Chief Justice Nichols said: "Appellants' decedent had been employed for years by appellee as a helper around a mattress and upholstering manufactory, and, incidental to that employment, he was sent on the day of the accident to assist in upholstering on a small speed boat, used for appellee's business during the week and on Sundays for pleasure. It is well established that generally federal courts have exclusive jurisdiction of admiralty matters, but where, as here, the enforcement of the state statute works no material prejudice to the characteristic features of the general maritime law, nor interferes with the proper harmony or uniformity of that law in its international or interstate relations, the general rule does not apply."

Equally illuminating is Madderns v. Fox Film Corp., 205 App.Div. 791, 200 N.Y.S. 344, 346, in which a moving picture actor, while enacting a scene on a boat in navigable waters, tripped and fell into the water. This was held to be local and the court said: "His work on the boat was merely incidental to his general duties as an actor, and had nothing to do with the boat, save to use it as a background for a moving picture, which, except for this single incident, was produced upon the land."

The employment was held to be merely local in Travelers' Insurance Co. v. Bacon, 30 Ga.App. 728, 119 S.E. 458, where an employee was to fish in the employer's boat in navigable waters, but always in sight of land, his compensation to be determined by the size of his catch, and he was drowned when he jumped into the water, after an explosion on the boat set fire to his clothes; also in United Dredging Co. v. Industrial Commission, 92 Cal.App. 110, 267 P. 763, where a man, employed as a helper and all-around man on a dredge, was drowned while operating a row boat used to carry men from the dredge to the shore.

Another leading case is In re Herbert, 283 Mass. 348, 186 N.E. 554, 555, and see notes on this case in 4 Detroit Law Rev. 36 and 38 Monthly Labor Rev. 99. Herbert worked on a scow used to ferry garbage to an island about two miles away in Boston Harbor. His job was to sweep the scow after it had been unloaded. He was engaged in this work while the scow was tied up at the island when he fell overboard. Said Chief Justice Rugg: "It seems

to us difficult to conceive of anything more local in its general nature * * *. It does not appear that the deceased had any work directly connected with maritime affairs. * * *"

The Supreme Court of Washington has held in two interesting cases that the employment was not maritime. In Dewey Fish Co. v. Department of Labor and Industries, 181 Wash. 95, 41 P.2d 1099, note 10 Wash.Law Rev. 165, the employee worked on vessels in the job of driving and capping piles and hanging upon these piles webbing which served as a fish trap. He also helped to service and repair these traps. He lived on the vessel through the fishing season but the vessel came into a sheltered cove at night. He had nothing to do with operating or navigating the vessel. In Eclipse Mill Co. v. Department of Labor and Industries, 141 Wash. 172, 251 P. 130, the employee worked upon navigable waters in booming and rafting logs preparatory to towing.

In three other cases the local doctrine was applied by state appellate courts. In McClain v. Kansas City Bridge Co., Mo. App. 1935, 83 S.W.2d 132, the employee was working as a laborer on a pile driver mounted on a boat anchored in the Missouri River, and the general job was that of placing piles in the river to turn the current. Quite similar was Belk v. Massman Construction Co., 133 Neb. 303, 275 N.W. 76, note 17 Neb.Law Rev. 39, in which the employee was hired to fire a boiler used to operate a pile driver on a barge. In Jones v. International Mercantile Marine Co., 252 App.Div. 347, 300 N.Y. S. 238, the employee was a watchman on a vessel which, though out of commission, had not been dismantled and was still seaworthy, and was temporarily laid up until the vessel would be needed later.

Other cases lighting the outer edge of, but held to be within, the local doctrine, were: Wooley v. E. M. Wichert Co., 275 Pa. 167, 118 A. 765, involving a fireman on a derrick boat which was anchored in a harbor and used for excavating purposes; McBride v. Standard Oil Co., 196 App.Div. 822, 188 N.Y.S. 90, chauffeur of truck sent to a vessel at a wharf to receive merchandise from a vessel; Lumbermen's Reciprocal Association v. Adcock, Tex.Civ. App. 1922, 244 S.W. 645, employee of a lumber company who worked on a raising boat on a navigable stream to raise logs; Bockhop v. Phœnix Transit Co., 97 N.J.L. 514, 117 A. 624, employee was injured while painting a ferry boat moored to a dock, when ferry boat was struck by a lighter; Sunny Point Packing Co. v. Faigh, 9 Cir., 63 F.2d 921, watchman on a fishing trap floating on navigable waters.

In South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 260, 60 S.Ct. 544, 549, 84 L.Ed. 732, the Supreme Court took care to point out that the Act was applicable to employees whose service was that of a sort performed by longshoremen and harbor workers. And in Sultan Ry. & Timber Co. v. Department of Labor, 277 U.S. 135, 48 S.Ct. 505, 72 L.Ed. 820, it was stated that the Act was not applicable even if the employee's work had some admiralty feature, provided this work had only incidental relation to navigation, so that the rights and duties of employer and employee could properly be regulated by local or state law, without working material prejudice to the characteristic features of the general maritime law.

Armistead's case, we think, differs from the cases discussed above by virtue of the fact that in all of these cases the tasks assigned, and the instructions given to the employee, necessarily involved the presence of the employee on navigable waters. Armistead, however, was a janitor and he had been expressly cautioned by his employers never to go on boats in navigable waters. Any authorization for Armistead's going on the ill-fated boat trip in question, which may be binding upon his employer, can be predicated only upon the theory that Cooper, the mechanic's helper, was a supervisory employee as to Armistead, and that Cooper's negative acquiescence to Armistead's presence in the boat on this trip might bring the making of this trip within the scope of Armistead's employment. Even should this theory be applicable here, we still believe that any admiralty feature of Armistead's employment falls well within the local doctrine, as that doctrine has been expounded and applied by the courts in connection with the Longshoremen's and Harbor Workers' Act. Armistead was not a mechanic; he had no expert knowledge of outboard motors. This record is devoid of any evidence which might show that, when Armistead was sent upon the errand on the day of his death, the officers of the Boat Corporation ever contemplated that he would go out upon the river in the boat owned by the brothers Crown.

Let us suppose that the officers of the Boat Corporation desired to take out insurance, which would fully protect the corporation against any claims for injury or death which might be made against it, arising out of any injury to, or any such death of, its employees. Would it have occurred to its officers, acting carefully and prudently, to take any policy so worded as to include within its coverage a possible claim against the corporation on the part of Armistead, under the Longshoremen's and Harbor Workers' Act? We hardly think so, even though the Boat Corporation employed too few employees to come within the Virginia Workmen's Compensation Act.

Since our decision in this case places the death of Armistead beyond the pale of the federal Act, and since the Boat Corporation is not subject to the State Compensation Act, the result we have reached may well seem unfortunate and regrettable. It is our function, however, to interpret and construe statutes, not to make them, and not to extend them beyond what appears to be the legislative intent. We cannot obey the Shakespearian maxim and wrest the law to our authority, even once. The Longshoremen's and Harbor Workers' Act is indeed a remedial statute, enacted to subserve an admirable purpose. It should perforce be construed liberally, even generously; but its provisions should not be so distorted by the courts as to make it a trap for employers.

The judgment of the District Court is reversed and the case is remanded to that court, with directions to enter judgment in favor of the plaintiff-appellant, Motor Boat Sales, Incorporated.

Reversed.