770

STANDARD DREDGING CORPORATION v.
HENDERSON, Deputy Commissioner,
et al.

No. 2382.

District Court, S. D. Alabama, S. D.
Nov. 22, 1944.

Marian Mayer (of Deutsch, Kerrigan & Stiles), of New Orleans, La., for plaintiff.

Albert J. Tully, U. S. Atty., of Mobile, Ala., for defendant Joseph H. Henderson.

Thomas E. Twitty (of Armbrecht, Inge, Twitty & Jackson), of Mobile, Ala., for defendants Jack and Syrenthia Johnson.

McDUFFIE, District Judge.

This matter involves a complaint filed by Standard Dredging Corporation for the purpose of reviewing, and seeking to set aside as not. in accordance with law, the order made by the defendant, Deputy Commissioner Henderson, directing the plaintiff to pay compensation to the defendants Jack Johnson and Syrenthia Johnson, the parents of Nathan Johnson, now deceased, who was an employee of the plaintiff. The matter was presented to this Court upon motion for temporary injunction and, by agreement of the parties, upon the merits, and upon the certified copy of the transcript of the proceedings before the Deputy Commissioner. There is evidence in the transcript as follows:

That on June 4, 1943, the employee, Nathan Johnson, was working for the employer as a laborer and as a member of a group of employees known as the "shore gang" working for the employer in connection. with dredging operations then being performed by the employer in the waters of the Intracoastal Canal where the canal traverses Oyster Bay in Baldwin County, Alabama, about 15 miles from the town of Foley, Alabama. The dredging operations were done pursuant to a contract between the employer and the War Department of the United States, United States Engineers, which contract called for the deepening and widening of said canal from a point at or near Carabelle, Florida, to a point at or near New Orleans, Louisiana. The dredging operations under that contract began at the eastern end of the project and proceeded westwardly.

In this dredging operation, the employer used a floating suction-type dredge known as the "Tampa", a floating barge to haul material and supplies, a number of floating pontoons used to support a line of metal pipe through which the dredged materials were pumped, and a tug boat used to maneuver the barge and dredge and to transport the employees to and from the mainland in going to and from their work, as well as to haul supplies used in the operation. On occasions when the dredged materials. were being deposited on shore or in waters too shallow for the pontoons, the discharge pipe was connected at the end of the pontoon line with other pipe extending to and upon the shore or into the marshes or shallow water where the material was to be discharged. Where needed, this shore pipe was supported in the shallow waters by wooden supports made by pine saplings driven into the bottom of the shallow water with a connecting cross-member upon which the pipe rested. As the work of deepening and widening this channel progressed, the dredge would move

forward in the channel thus causing the pontoon line, and when in use the shore line, to become more extended. This process necessitated frequent changes in the position of the pontoon line and in the shore line and the lengthening or shortening of these lines. The depositing of the dredged materials whether on the shore or in the shallow waters resulted in a pile which also necessitated the lengthening or shortening of the shore pipe line.

The work of the shore gang consisted primarily of adjusting and maneuvering the shore pipe line from the end of the pontoon line to the point of discharge of material, and the moving and hauling of the pipe and other material and supplies used in that phase of the work. The members of the shore gang, whenever necessary, loaded the shore pipe and other supplies on to the barge, and then, when the barge had been moved by the tug to another point, they unloaded the pipe or supplies. Members of the shore gang, whenever called upon, went to and from the dredge to get tools, equipment, supplies or drinking water, and in so doing either walked upon the pipe of the pontoon line or used skiffs or rowboats. Employees, including the members of the shore gang, changed their clothes on the dredge when reporting to work and when leaving work. The employer furnished the tug boat to take the employees to and from the mainland and furnished a truck in taking them between the landing on the mainland and their living quarters near the town of Foley.

On the date of his death, Nathan Johnson performed the usual work of a member of the shore gang as just described and was walking the pontoon pipe line back to the dredge for the purpose of changing from his work clothes to his street clothes, then to be transported by the tug to the mainland, when his foot slipped and he fell off the pipe into the water and was drowned. Admittedly, he met his death by accident upon navigable waters and by drowning in such waters. The deceased's father and mother together with his brother all testified that the deceased contributed substantially to their support and that they were partially dependent upon him.

The dredging company in this case urges that the work done by the deceased employee as a member of the shore gang, was not maritime employment; that under the facts and circumstances of this case this matter is governed by the State law; and that the parents were not partially dependent upon the deceased. In other words, the plaintiff argues that since the duties of the members of the shore gang were performed predominantly on land, their work must be considered to be non-maritime, and that, to say the least, their employment was so local in character that the State law could validly apply under the so-called "local concern" doctrine.

The plaintiff begins with the Lindberg case (Lindberg v. Southern Casualty Co.) found in D.C., 15 F.2d 54, and affirmed in United Dredging Co. v. Lindberg, 5 Cir., 18 F.2d 453, in which the learned Judge Hutcheson relied upon and so ably discussed that doctrine. Congress expressly provided in the Longshoremen's Act, 33 U.S.C.A. § 903, that compensation is payable under that Act only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. This language of the statute, as construed by the cases which have expounded the "local concern" doctrine, had always seemed clear enough to this Court until the decision of the United States Supreme Court in the Parker case (Parker v. Motor Boat Sales) 314 U.S. 244, 62 S.Ct. 221, 223, 86 L.Ed. 184. In that case, the employee was a porter or janitor in a store which sold small boats, maritime supplies and outboard motors, and his duties were those customarily performed by a porter or janitor. On the occasion of his death, the employee happened to be riding in a skiff on navigable water while an outboard motor attached to the skiff was being demonstrated or tested by another employee for the purpose of selling it to a customer. The Court held that the employee was engaged in maritime employment and that the work was not local in character and that the State law could not validly apply. As to the "local concern" doctrine the Court said: "This proposition cannot be rested on the ground that Armistead, hired primarily as a janitor and porter, was predominantly a non-maritime employee. For habitual performance of other and different duties on land cannot alter the fact that at the time of the accident he was riding in a boat on a navigable river, and it is in connection

with that clearly maritime activity that the award was here made. * * * Moreover, section 2(4) of the Act, 33 U.S.C.A. § 902 (4), expressly provides for its application to 'employees (who) are employed * * * in whole or *in part,* upon the navigable waters of the United States'."

Thus we see that the Supreme Court has placed great emphasis upon the activity of the employee at the moment of his injury, in determining the jurisdictional question involved.

Shortly after the decision in the Parker case, supra, the Radcliff Gravel Co. case (Radcliff Gravel Co. v. Henderson) arose in this Court. In that case the employer was engaged in the business of selling sand and gravel in the City of Mobile, Alabama, and adjacent territory. The gravel was obtained by dredging it from the bottom of navigable waters. As the gravel was dredged it was dumped upon a barge, and several of the employees would then trim or spread the gravel on the barge. While these employees were being transported from the barge to the shore at the end of their day's work, the skiff in which they were riding capsized and two of them were drowned. This Court, confronted with the Parker case, held that the Longshoremen's Act applied notwithstanding the "local concern" doctrine. That decision was affirmed by the Court of Appeals for the Fifth Circuit, see 138 F.2d 549, and certiorari was denied by the Supreme Court, see 321 U.S. 782, 64 S.Ct. 638, 88 L.Ed. ——.

In view of the two decisions hereinabove discussed, this Court must follow them and hold that the Longshoremen's Act applies to the present case.

If the porter or janitor involved in the Parker case was engaged in maritime employment, then certainly the employee involved in the present case, as a member of the shore gang, was so engaged. At the time of this accident the dredge "Tampa" was engaged in deepening and widening the Intracoastal Canal and thus improving navigation, and the work of the employee, even though predominantly done upon shore, was an integral part of the dredging operation. In order to determine the nature of the employment of the employee, consideration should be given to the nature of the project or enterprise being performed or undertaken by the employer, and less emphasis placed upon the "activity" of the employee at the particular moment of his injury. This Court believes that if this were done, the dilemma referred to as the "Twilight Zone" by Mr. Justice Black in the Davis case, (Davis v. Department of Labor and Industries of Washington) 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246, would to some extent at least fade away. This Court feels that the decisions might be clarified by recognizing the non-maritime character, as well as the local character, of a marine supply business (Parker case) or a sand and gravel business (Radcliff case) or a construction business (Davis case), as distinguished from a stevedoring business or a dry dock, or a dredging business.

In this case, the project was clearly maritime in its nature, and if the spoils dumped on or near the shore were later used as a foundation for a road or highway, as contended by the plaintiff, that was simply an incidental result and not the real purpose of the dredging operation, as the employer's contract was to deepen and widen the canal and not to build a highway.

It is difficult for the Court to see what is left of the so-called "local concern" doctrine in view of the fact that it was held in the Parker case that the doctrine did not apply to the testing or demonstration of an outboard motor, and in the Radcliff case it was held that the doctrine did not apply to the business of recovering gravel from the bed of navigable water, to be sold by the employer on the local market in Mobile to be used in the construction of buildings, highways and the like. The work of improving the navigability of this Intracoastal Canal in this case was certainly less local in its character than the employment involved in either of the other two cases just discussed. If Congress intended that the application of State law to the situations involved in the Parker case and the Radcliff case would interfere with the harmony and uniformity of the general admiralty law—a conclusion which this Court still cannot reconcile with the language of the Act—then certainly the State law cannot be applied here, as the work in this case directly involved the improvement of navigation.

As to the dependency of the parents, the Courts have been liberal in this respect and there is evidence in the transcript sufficient to meet the test of partial dependency. See Wende v. McManigal, 2 Cir., 135 F.2d 151; Texas Employers' Ins. Ass'n v. Sheppeard, D.C., 62 F.2d 122.

The Court therefore holds that the petition of the Standard Dredging Corporation must be denied and dismissed and that the awards of the Commissioner be affirmed. The appropriate order has been entered.