# DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR *v.* PERINI NORTH RIVER ASSOCIATES ET AL.

No. 81–897.   Argued October 4, 1982—Decided January 11, 1983

298

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, and POWELL, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgment, *post*, p. 325. STEVENS, J., filed a dissenting opinion, *post*, p. 325.

*Richard G. Wilkins* argued the cause *pro hac vice* for petitioner. With him on the briefs were *Solicitor General Lee, Deputy Solicitor General Geller, T. Timothy Ryan, Jr., Donald S. Shire, Kerry L. Adams, Mark C. Walters*, and *Joshua T. Gillelan II.*

*Martin Krutzel* argued the cause for respondents Perini North River Associates et al. With him on the brief for respondents Perini North River Associates et al. was *Richard A. Cooper. David MacRae Wagner* filed a brief for Raymond Churchill, respondent under this Court's Rule 19.6.

JUSTICE O'CONNOR delivered the opinion of the Court.

In 1972, Congress amended the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. (part 2) 1424, as

amended, 33 U. S. C. § 901 *et seq.* (1976 ed. and Supp. V) (hereinafter LHWCA or Act). Before 1972, LHWCA coverage extended only to injuries sustained on the actual "navigable waters of the United States (including any dry dock)." 44 Stat. (part 2) 1426. As part of its 1972 Amendments of the Act, Congress expanded the "navigable waters" *situs* to include certain adjoining land areas, § 3(a), 86 Stat. 1251, 33 U. S. C. § 903(a). At the same time, Congress added a *status* requirement that employees covered by the Act must be "engaged in maritime employment" within the meaning of § 2(3) of the Act.[1] We granted certiorari in this case, 455 U. S. 937 (1982), to consider whether a marine construction worker, who was injured while performing his job upon actual navigable waters,[2] and who would have been covered by the Act before 1972, is "engaged in maritime employment" and thus covered by the amended Act.[3] We hold that the worker is "engaged in maritime employment" for purposes of

---

[1] Section 2(3) of the Act, 86 Stat. 1251, 33 U. S. C. § 902(3), provides: "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net."

[2] We use the expression "actual navigable waters" to describe the covered situs as it existed in the 1927 LHWCA, 44 Stat. (part 2) 1424: "navigable waters of the United States (including any dry dock)." *Id.*, at 1426. As explained below, the 1972 Amendments to the LHWCA expanded the concept of "navigable waters" to include certain adjoining shoreside areas. § 3(a), 33 U. S. C. § 903(a).

[3] In *Northeast Marine Terminal Co.* v. *Caputo,* 432 U. S. 249 (1977), we examined the scope of the § 2(3) *status* requirement as it applied to injuries that occurred on the newly covered landward *situs.* In that case, we expressly declined to speculate whether congressional addition of the *status* requirement meant that "Congress excluded people who would have been covered before the 1972 Amendments; that is, workers who are injured on the navigable waters as previously defined." *Id.*, at 265, n. 25.

coverage under the amended LHWCA. Accordingly, we reverse the decision below.

## I

The facts are not in dispute. Respondent Perini North River Associates (Perini) contracted to build the foundation of a sewage treatment plant that extends approximately 700 feet over the Hudson River between 135th and 145th Streets in Manhattan. The project required that Perini place large, hollow circular pipes called caissons in the river, down to embedded rock, fill the caissons with concrete, connect the caissons together above the water with concrete beams, and place precast concrete slabs on the beams. The caissons were delivered by rail to the shore, where they were loaded onto supply barges and towed across the river to await unloading and installation.

The injured worker, Raymond Churchill, was an employee of Perini in charge of all work performed on a cargo barge used to unload caissons and other materials from the supply barges and to set caissons in position for insertion into the embedded rock. Churchill was on the deck of the cargo barge giving directions to a crane operator engaged in unloading a caisson from a supply barge when a line used to keep the caissons in position snapped and struck Churchill. He sustained injuries to his head, leg, and thumb.[4]

Churchill filed a claim for compensation under the LHWCA. Perini denied that Churchill was covered by the Act, and after a formal hearing pursuant to § 19 of the Act, 33 U. S. C. § 919 (1976 ed. and Supp. V), an Administrative Law Judge determined that Churchill was not "engaged in maritime employment" under § 2(3) of the Act because his job lacked "some relationship to navigation and commerce on navigable waters." App. to Pet. for Cert. 31a. Churchill and the Director, Office of Workers' Compensation Programs

---

[4] At the time Churchill was injured, he was working on a barge in actual navigable waters. There is no claim that he was standing on the foundation of the sewage treatment plant.

(Director), appealed to the Benefits Review Board, pursuant to § 21(b)(3) of the Act, 33 U. S. C. § 921(b)(3). The Board affirmed the Administrative Law Judge's denial of coverage, on the theory that marine construction workers involved in building facilities not ultimately used in navigation or commerce upon navigable waters are not engaged in "maritime employment." 12 BRBS 929, 933 (1980).[5] One Board Member dissented, arguing that "all injuries sustained in the course of employment by employees over 'navigable waters' as that term was defined prior to the 1972 Amendments, are covered under the [amended] Act." *Id.*, at 935.[6]

Churchill then sought review of the Board's decision in the Court of Appeals for the Second Circuit, under § 21(c) of the Act, 33 U. S. C. § 921(c).[7] The Director participated as respondent, and filed a brief in support of Churchill's position. The Second Circuit denied Churchill's petition, relying on its decision in *Fusco* v. *Perini North River Associates*, 622 F. 2d 1111 (1980), cert. denied, 449 U. S. 1131 (1981). According to the Second Circuit, Churchill was not in "maritime employment" because his employment lacked a "'significant relationship to navigation or to commerce on navigable waters.'" *Churchill* v. *Perini North River Associates*, 652 F. 2d 255, 256, n. 1 (1981). The Director now seeks review of the Second Circuit denial of Churchill's petition. The Director agrees with the position taken by the dissenting member of the Benefits Review Board: the LHWCA does not require

---

[5] The Board also determined that Churchill's duties did not make him a "person engaged in longshoring operations" under § 2(3) of the LHWCA.

[6] The dissenting Board member also relied on this Court's decision in *Sun Ship, Inc.* v. *Pennsylvania*, 447 U. S. 715 (1980), to support his position.

[7] Title 33 U. S. C. 921(c) provides in pertinent part:

"(c) Any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred, by filing in such court within sixty days following the issuance of such Board order a written petition praying that the order be modified or set aside. . . ."

that an employee show that his employment possesses a "significant relationship to navigation or to commerce," where, as here, the employee is injured while working upon the actual navigable waters in the course of his employment, and would have been covered under the pre-1972 LHWCA.[8]

## II

Before we consider whether Churchill is covered by the Act, we must address Perini's threshold contention that the Director does not have standing to seek review of the decision below. According to Perini, the Director's only interest in this case is in furthering a different interpretation of the Act than the one rendered by the Administrative Law Judge, the Benefits Review Board, and the Court of Appeals.[9]

Perini's claim ignores the procedural posture in which this case comes before the Court. That posture makes it unnecessary for us to consider whether the Director, as the agency

---

[8] The Ninth Circuit is in agreement with the Second Circuit position. See *Weyerhaeuser Co.* v. *Gilmore*, 528 F. 2d 957 (1975), cert. denied, 429 U. S. 868 (1976). The Fifth Circuit takes a position contrary to that of the Second Circuit and Ninth Circuit. See *Boudreaux* v. *American Workover, Inc.*, 680 F. 2d 1034 (1982) (en banc) (Tate, J.).

[9] Perini bases its standing argument on § 21(c) of the Act, 33 U. S. C. § 921(c). See n. 7, *supra*. According to Perini, the Director is not "adversely affected or aggrieved" by the decision below, and does not have standing before this Court. Perini relies on several Court of Appeals decisions which, in construing § 21(c), have held the Director to be without *statutory* standing in cases before the Courts of Appeals. See *Fusco* v. *Perini North River Associates*, 601 F. 2d 659 (CA2 1979), vacated and remanded on other grounds, 444 U. S. 1028, adhered to on remand, 622 F. 2d 1111 (CA2 1980), cert. denied, 449 U. S. 1131 (1981); *Director, OWCP* v. *Donzi Marine, Inc.*, 586 F. 2d 377 (CA5 1978); and *I. T. O. Corp. of Baltimore* v. *Benefits Review Board*, 542 F. 2d 903 (CA4 1976), vacated and remanded on other grounds *sub nom. Adkins* v. *I. T. O. Corp. of Baltimore*, 433 U. S. 904, adhered to on remand, 563 F. 2d 646 (1977).

Section 21(c) is not relevant to our present inquiry. Perini concedes that § 21(c) applies on its face to statutory review before the courts of appeals. Moreover, the cases on which Perini relies do not purport to address the Art. III standing issue.

official "responsible for the administration and enforcement" of the Act,[10] has standing as an aggrieved party to seek review of the decision below.[11]   The Director is not alone in arguing that Churchill is covered under the LHWCA.   Churchill, the injured employee, is before the Court as well.   He has filed a brief in support of the Director's request for a writ of certiorari, and a brief addressing the merits of his claim, in which he presents the same arguments presented by the Director.   But, for some reason that is not entirely clear, Churchill has not elected to seek review as a petitioner, and by virtue of the Rules of this Court, he is considered a party

---

[10] 20 CFR § 802.410(b) (1982).   Section 39 of the Act, as set forth in 33 U. S. C. § 939, provides that "the Secretary [of Labor] shall administer the provisions of this chapter, and for such purpose the Secretary is authorized (1) to make such rules and regulations . . . as may be necessary in the administration of this chapter."   The Secretary has assigned enforcement and administration responsibilities to the Director.

[11] We acknowledge that on three occasions, this Court has granted petitions for certiorari to review cases brought by the Director.   See *Director, OWCP v. Walter Tantzen, Inc.*, 446 U. S. 905 (1980), vacating and remanding *Walter Tantzen, Inc. v. Shaughnessy*, 601 F. 2d 670 (CA2 1979), revised on remand, 624 F. 2d 5 (1980); *Director, OWCP v. Rasmussen*, 436 U. S. 955 (1978); and *Director, OWCP v. Jacksonville Shipyards, Inc.*, 433 U. S. 904 (1977), vacating and remanding *Jacksonville Shipyards, Inc. v. Perdue*, 539 F. 2d 533 (CA5 1976), adhered to on remand, 575 F. 2d 79 (1978), cert. denied, 440 U. S. 967 (1979).

*Tantzen* and *Jacksonville Shipyards* were both summary dispositions, and *Rasmussen* was decided on the merits, see *Director, OWCP v. Rasmussen*, 440 U. S. 29 (1979).   In none of these cases did we have occasion to consider whether the Director had standing in his own right to seek review of a decision of the Benefits Review Board *with which the Director disagreed.*   In *Rasmussen*, the employer and the insurer also petitioned for certiorari, and the cases were consolidated.   It was not necessary to consider the issue of the Director's standing in that case because a justiciable controversy was before the Court by virtue of the petition of the employer and insurer.   In both *Tantzen* and *Jacksonville*, the Director had defended a Board decision in the Courts of Appeals as the federal respondent, and continued to defend the Board decision before this Court.   See n. 13, *infra.*

respondent.[12]   It is in this procedural context that Perini's challenge to Art. III standing must be considered.   Perini concedes that the Director was a proper party respondent before the Court of Appeals in this litigation.[13]   As party respondent below, the Director is entitled under 28 U. S. C. § 1254(1) to petition for a writ of certiorari.   Although the Director has statutory authority to seek review in this Court, he *may* not have Art. III standing to argue the merits of Churchill's claim because the Director's presence does not guarantee the existence of a justiciable controversy with respect to the merits of Churchill's coverage under the LHWCA.   However, the Director's petition makes Churchill an automatic respondent under our Rule 19.6, and in that capacity, Churchill "may seek reversal of the judgment of the Court of Appeals on any ground urged in that court." *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773, 783–784, n. 14 (1980).   The Director's petition, filed under 28

---

[12] This Court's Rule 19.6 provides in part: "All parties other than petitioners shall be respondents, but any respondent who supports the position of a petitioner shall meet the time schedule for filing papers which is provided for that petitioner . . . ."

Under Rule 19.6, Churchill is a party in this Court by virtue of his being a party in the proceedings below.   Moreover, he has demonstrated his continued stake in the outcome of this case by filing in support of the Director at both the certiorari and merits stages of the proceedings.

[13] The fact that Perini concedes that the Director was a proper party respondent before the Court of Appeals in this case means that no question is thereby presented concerning whether the Director, as party respondent below, is a "party" for purposes of 28 U. S. C. § 1254(1), which states that a writ of certiorari may be "granted upon the petition of any party" below.

Given that the parties do not question the identity of the federal respondent, it is not necessary for us to decide the issue explicitly left open by the Court in *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S., at 256, n. 11, as to whether the Director is a proper party respondent in the Court of Appeals.   Although we declined to address this issue because the parties did not raise it in *Northeast Marine Terminal*, we noted that "[t]he Department of Labor has recently promulgated a regulation making it clear that the Director of OWCP is the proper federal party in a case of this nature.   42 Fed. Reg. 16133 (Mar. 1977)." *Ibid.*

U. S. C. § 1254(1), brings Churchill before this Court, and there is no doubt that Churchill, as the injured employee, has a sufficient interest in this question to give him standing to urge our consideration of the merits of the Second Circuit decision.

The constitutional dimension of standing theory requires, at the very least, that there be an "actual injury redressable by the court." *Simon* v. *Eastern Kentucky Welfare Rights Org.*, 426 U. S. 26, 39 (1976). This requirement is meant "to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," as well as to assure "an actual factual setting in which the litigant asserts a claim of injury in fact." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982). The presence of Churchill as a party respondent arguing for his coverage under the Act assures that an admittedly justiciable controversy is now before the Court.

## III

The question of Churchill's coverage is an issue of statutory construction and legislative intent. For reasons that we explain below, there is no doubt that Churchill, as a marine construction worker injured upon actual navigable waters in the course of his employment upon those waters, would have been covered by the LHWCA before Congress amended it in 1972. In deciding whether Congress intended to restrict the scope of coverage by adding the § 2(3) status requirement, we must consider the scope of coverage under the pre-1972 Act and our cases construing the relevant portions of that Act. We must then focus on the legislative history and purposes of the 1972 Amendments to the LHWCA to determine their effect on pre-existing coverage.

## A

Beginning with our decision in *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205 (1917), we held that there were certain circumstances in which States could not, consistently with Art. III, § 2, of the Constitution, provide compensation to injured maritime workers.[14] If the employment of an injured worker was determined to have no "direct relation" to navigation or commerce, and "the application of local law [would not] materially affect" the uniformity of maritime law, then the employment would be characterized as "maritime but local," and the State could provide a compensation remedy. *Grant Smith-Porter Ship Co.* v. *Rohde*, 257 U. S. 469, 477 (1922). See also *Western Fuel Co.* v. *Garcia*, 257 U. S. 233, 242 (1921). If the employment could not be characterized as "maritime but local," then the injured employee would be left without a compensation remedy.

After several unsuccessful attempts to permit state compensation remedies to apply to injured maritime workers whose employment was not local,[15] Congress passed the LHWCA in 1927, 44 Stat. (part 2) 1424. Under the original statutory scheme, a worker had to satisfy five primary conditions in order to be covered under the Act. First, the worker had to satisfy the "negative" definition of "employee" contained in § 2(3) of the 1927 Act in that he could not be a "master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." *Id.*, at 1425.[16] Second, the

---

[14] Article III, § 2, extends the federal power "to all Cases of admiralty and maritime Jurisdiction." In *Jensen,* we held that state compensation Acts could not cover longshoremen injured seaward of the water's edge. The line of demarcation between land and water became known as the "*Jensen* line."

[15] See *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149 (1920); *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219 (1924).

[16] Section 3(a), 44 Stat. (part 2) 1426, also excluded from coverage "[a]n officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof."

worker had to suffer an "injury" defined by § 2(2) as "accidental injury or death arising out of and in the course of employment . . . ." *Ibid.* Third, the worker had to be employed by a statutory "employer," defined by § 2(4) as "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)." *Ibid.*[17] Fourth, the worker had to meet a "situs" requirement contained in § 3(a) of the Act that limited coverage to workers whose "disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock)." *Id.*, at 1426. Fifth, § 3(a) precluded federal compensation unless "recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law." *Ibid.*

Federal compensation under the LHWCA did not initially extend to all maritime employees injured on the navigable waters in the course of their employment. As mentioned, § 3(a) of the 1927 Act permitted federal compensation only if compensation "may not validly be provided by State law." *Ibid.* This language was interpreted to exclude from LHWCA coverage those employees whose employment was "maritime but local." See, *e. g., Crowell* v. *Benson*, 285 U. S. 22 (1932). Application of the "maritime but local" doctrine required case-by-case determinations, and a worker was often required to make a perilous jurisdictional "guess" as to which of two mutually exclusive compensation schemes was applicable to cover his injury. Employers faced uncertainty as to whether their contributions to a state insurance fund would be sufficient to protect them from liability.

In *Davis* v. *Department of Labor*, 317 U. S. 249 (1942), this Court recognized that despite its many cases involving the

---

[17] The 1927 Act did not contain any provision that an injured employee must be "engaged in maritime employment" at the time of injury in order to be covered. Rather, the Act employed the expression "maritime employment" only as part of the definition of a statutory "employer."

"maritime but local" doctrine, it had "been unable to give any guiding, definite rule to determine the extent of state power in advance of litigation . . . ." *Id.*, at 253. Employees and employers alike were thrust on "[t]he horns of [a] jurisdictional dilemma." *Id.*, at 255.[18] *Davis* involved an employee

---

[18] In *Davis*, our concern for the employer's dilemma was related to the fact that because the employer did not know with any certainty whether his employee would be covered under the LHWCA, "[t]he employer's contribution to a state insurance fund may therefore wholly fail to protect him against the liabilities for which it was specifically planned." 317 U. S., at 255. We resolved that dilemma in *Calbeck* v. *Travelers Insurance Co.*, 370 U. S. 114 (1962), by making it clear to employers that if they required their employees to work upon actual navigable waters, those employees would be covered by the LHWCA. The dissent takes this certainty in favor of LHWCA coverage to mean that in 1972 Congress wanted to ensure that employers like Perini would have only to pay for *state* compensation benefits, and would not have to obtain more costly LHWCA protection.

The dissent's concern about duplicative insurance seems exaggerated for two reasons. First, even under the dissent's view of coverage, both state and federal remedies are available to injured workers, and employers with employees working on the shore would have to contribute to state compensation funds in the event that an employee covered by the LHWCA's shoreside extension sought state compensation, or an employee was deemed for whatever reason not to be eligible for LHWCA relief. "[T]he 1972 extension of federal jurisdiction supplements, rather than supplants, state compensation law." *Sun Ship, Inc.* v. *Pennsylvania*, 447 U. S., at 720.

We also note that the dissent argues that before 1972, the financial burden of duplicative coverage was not heavy because LHWCA benefits were lower than they now are, and insurance carriers would cover LHWCA operations for a nominal addition to state compensation program premiums. There is nothing in the record in this case, in the legislative history, or, for that matter, in the dissent, concerning whether the relative spread between state and federal insurance premiums is higher now than before 1972.

Second, the dissent's view clearly does not result in any certainty whatsoever for employers like Perini with respect to whether those employers have to pay for LHWCA coverage. If any Perini employee (including Churchill) were to engage in loading, unloading, or repairing of the barge on which Churchill was working, the employee would be covered. Indeed,

who was injured while dismantling a bridge from a standing position on a barge. We upheld the application of the state compensation law in *Davis* not because the employee was engaged in "maritime but local" employment, but because we viewed the case as in a "twilight zone" of concurrent jurisdiction where LHWCA coverage was available and where the applicability of state law was difficult to determine. We held that doubt concerning the applicability of state compensation Acts was to be resolved in favor of the constitutionality of the state remedy. Relying in part on *Davis*, the Court in *Calbeck* v. *Travelers Insurance Co.*, 370 U. S. 114 (1962), created further overlap between federal and state coverage for injured maritime workers. In *Calbeck*, we held that the LHWCA was "designed to ensure that a compensation remedy existed for all injuries sustained by employees [of statutory employers] on navigable waters, and to avoid uncertainty as to the source, state or federal, of that remedy." *Id.*, at 124. Our examination in *Calbeck* of the "complete legislative history" of the 1927 LHWCA revealed that Congress did not intend to incorporate the "maritime but local" doctrine in the Act. *Id.*, at 120. "Congress used the phrase 'if recovery . . . may not validly be provided by State law' in a sense consistent with the delineation of coverage as reaching injuries occurring on navigable waters." *Id.*, at 126.[19]

Before 1972, there was little litigation concerning whether an employee was "in maritime employment" for purposes of being the employee of a statutory employer: "Workers who

---

if Churchill himself had to make some minor mechanical adjustment on the barge and was injured while doing so, he would be covered under the dissent's view.

[19] We noted in *Sun Ship, Inc.* v. *Pennsylvania*, *supra*, that in extending LHWCA coverage into the "maritime but local" zone, *Calbeck* did not overturn *Davis* "by treating the federal statute as exclusive." 447 U. S., at 718–719. Rather, *Calbeck* eliminated the "jurisdictional dilemma" that resulted from the existence of two spheres of exclusive jurisdiction, by making injuries within the "maritime but local" sphere compensable under either state or federal law.

are not seamen but who nevertheless suffer injury on navigable waters are no doubt (or so the courts have been willing to assume) engaged in 'maritime employment.'" G. Gilmore & C. Black, Law of Admiralty 428 (2d ed. 1975) (Gilmore & Black). One case in which we did discuss the maritime employment requirement was *Parker* v. *Motor Boat Sales, Inc.*, 314 U. S. 244 (1941). In *Parker*, the injured worker, hired as a janitor, was drowned while riding in one of his employer's motorboats keeping lookout for hidden objects under the water. When the employee's beneficiary sought LHWCA compensation, the employer argued that the employment was "'so local in character'" that the State could validly have provided a remedy, and the § 3(a) language ("if recovery . . . may not validly be provided by State law") precluded federal relief. *Id.*, at 246. A unanimous Court rejected the employer's argument, and held that the employee was engaged in maritime employment and that LHWCA coverage extended to an employee injured on the navigable waters in the course of his employment, without any further inquiry whether the injured worker's employment had a direct relation to navigation or commerce.[20] In abolishing the "jurisdictional dilemma" created by the "maritime but local" doctrine, *Calbeck* relied heavily on *Parker*, see 370 U. S., at 127–128.

---

[20] The majority opinion in *Davis* assumed that if the claimant in that case sought federal relief, and such relief was awarded at the administrative stage of the proceedings, the Court would have sustained the award under *Parker*. In his dissent in *Davis*, Chief Justice Stone argued that the federal Act applied to give exclusive relief in that case: "after our decision in *Parker* v. *Motor Boat Sales*, . . . [the *Davis* claimant's] right of recovery under the federal act can hardly be doubted." 317 U. S., at 260.

Professor Robertson has noted that "*Parker* should have meant the abolition of the 'maritime but local' exception," but that *Davis* indicated that the doctrine had continued vitality. D. Robertson, Admiralty and Federalism 210 (1970). Professor Robertson also states that if the claimant in *Davis* had sought federal, rather than state, compensation, "the *Parker* case would certainly have said that [the claimant] could get it." *Id.*, at 211.

It becomes clear from this discussion that the 1927 Act, as interpreted by *Parker*, *Davis*, and *Calbeck*, provided coverage to those employees of statutory "employers," injured while working upon navigable waters in the course of their employment. Indeed, the consistent interpretation given to the LHWCA before 1972 by the Director, the Deputy Commissioners, the courts, and the commentators was that (except for those workers specifically excepted in the statute), *any* worker injured upon navigable waters in the course of employment was "covered . . . without any inquiry into what he was doing (or supposed to be doing) at the time of his injury." Gilmore & Black, at 429–430.[21] As a marine con-

---

[21] The dissent attempts to carve a new "maritime but local" area in which the exclusive remedy is state compensation. The dissent argues that Congress meant to exclude from LHWCA coverage all employees who are not longshoremen or harbor workers, and that only longshoremen and harbor workers possess the "direct link to maritime commerce" necessary for LHWCA coverage. According to the dissent, the pre-1972 case law, with the exception of *Parker*, supports its position. The dissent's view rests on a misreading of our decisions in *Davis* and *Calbeck*, and a failure to consider the impact of *Parker*, *Davis*, and *Calbeck* on the scope of pre-1972 coverage.

The dissent points out that *Davis* involved an employee who sought state compensation, and it concludes that *Davis* says nothing about LHWCA coverage. The employee in *Davis* was standing on a barge and assisting in the dismantling of a bridge, an activity that would clearly not have the "direct link to maritime commerce" that the dissent suggests is required. Although the *Davis* employee sought state compensation, both the *Davis* majority and the *Davis* dissent assumed that *if* the *Davis* employee sought LHWCA coverage, *Parker* would require that he get it. In *Calbeck*, the claimants were welders performing work on vessels, but our holding in *Calbeck* was clearly predicated on *Parker* and *Davis*, and cannot properly be characterized as a case where LHWCA coverage was predicated on the existence of some "direct link to maritime commerce" or "traditional" LHWCA employment. The dissent claims that since Churchill could be covered by a state compensation remedy, it is consistent with *Calbeck* to deny LHWCA coverage. This, of course, neglects the fact that *Calbeck* made clear that "Congress brought under the coverage of the Act all such injuries [suffered by employees working on the navigable waters] whether

struction worker required to work upon navigable waters, and injured while performing his duties on navigable waters, there can be no doubt that Churchill would have been covered under the 1927 LHWCA.

or not a particular one was also within the constitutional reach of a state workmen's compensation law." 370 U. S., at 126–127.

*Parker, Davis,* and *Calbeck* were read by the lower federal and state courts not to limit LHWCA coverage only to "traditional" maritime activities, but to cover injuries that occurred on the navigable waters in the course of employment. See, *e. g., Nalco Chemical Corp.* v. *Shea,* 419 F. 2d 572 (CA5 1969) (a pilot salesman traveling to offshore platform); *Interlake S.S. Co.* v. *Nielsen,* 338 F. 2d 879 (CA6 1964) (watchman), cert. denied, 381 U. S. 934 (1965); *Radcliff Gravel Co.* v. *Henderson,* 138 F. 2d 549 (CA5 1943) (workers who trimmed sand and gravel loaded on barges after being dredged from water bed), cert. denied, 321 U. S. 782 (1944); *Rex Investigative and Patrol Agency, Inc.* v. *Collura,* 329 F. Supp. 696 (EDNY 1971) (land-based employee sent temporarily onto vessel to act as watchman); *Standard Dredging Corp.* v. *Henderson,* 57 F. Supp. 770 (Ala. 1944) (employee engaged in dredging bed of intracoastal canal); *Ford* v. *Parker,* 52 F. Supp. 98 (Md. 1943) (night watchman); *Perry* v. *Baltimore Contractors, Inc.,* 202 So. 2d 694 (La. App. 1967) (worker injured while diving in order to assist in construction of a tunnel under intracoastal canal), cert. denied, 390 U. S. 1028 (1968). This list is by no means exhaustive, and does not include various administrative decisions.

In another case, *Pennsylvania R. Co.* v. *O'Rourke,* 344 U. S. 334 (1953), we held that a statutory "employer" existed as long as the employer had *any* employee engaged in "maritime employment," and that it was not necessary that the injured employee be the *one* employee that made his employer a statutory "employer." However, we also held in that case that the injured employee was, in fact, engaged in maritime employment when he was working as a railway brakeman, removing railroad cars from a car float by the use of an ordinary switch engine. *Id.,* at 340. Although *Pennsylvania R. Co.* involved a question as to which of two federal statutes applied to cover the employee's injury (the LHWCA or the Federal Employers' Liability Act), and did not involve an application of the "maritime but local" doctrine, the Deputy Commissioners had interpreted *Pennsylvania R. Co.* to mean "that injury over the water means, without much more inquiry, that they ought to grant [LHWCA] awards." Robertson, *supra* n. 20, at 220. In the two cases that came to us in *Calbeck,* the Deputy Commissioners had granted LHWCA awards on the basis of *Pennsylvania R. Co.* See Robertson, *supra* n. 20, at 219–220.

B

In its "first significant effort to reform the 1927 Act and the judicial gloss that had been attached to it," Congress amended the LHWCA in 1972. *Northeast Marine Terminal Co. v. Caputo*, 432 U. S. 249, 261 (1977). The purposes of the 1972 Amendments were to raise the amount of compensation available under the LHWCA, to extend coverage of the Act to include certain contiguous land areas, to eliminate the longshoremen's strict-liability seaworthiness remedy against shipowners, to eliminate shipowner's claims for indemnification from stevedores, and to promulgate certain administrative reforms. See S. Rep. No. 92–1125, p. 1 (1972) (hereinafter S. Rep.); H. R. Rep. No. 92–1441 (1972) (hereinafter H. R. Rep.).

For purposes of the present inquiry, the important changes effected by the 1972 Amendments concerned the definition of "employee" in § 2(3), 33 U. S. C. § 902(3), and the description of coverage in § 3(a), 33 U. S. C. § 903(a). These amended sections provide:

> "The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." § 2(3), 33 U. S. C. § 902(3).

> "Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading,

repairing, or building a vessel) . . . ." § 3(a), as set forth in 33 U. S. C. § 903(a).[22]

"The 1972 Amendments thus changed what had been essentially only a 'situs' test of eligibility for compensation to one looking to both the 'situs' of the injury and the 'status' of the injured." *Northeast Marine Terminal Co., supra,* at 264–265. In expanding the covered situs in § 3(a), Congress also removed the requirement, present in § 3(a) of the 1927 Act, that federal compensation would be available only if recovery "may not validly be provided by State law." The definition of "injury" remained the same,[23] and the definition of "employer" was changed to reflect the new definition of "employee" in § 2(3).[24]

---

[22] We note that the new coverage section still provides that no compensation shall be paid to "[a]n officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof." § 3(a)(2), 33 U. S. C. § 903(a)(2).

[23] "Injury" is defined in § 2(2), 33 U. S. C. § 902(2), as "accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment."

[24] "Employer" is defined in § 2(4), 33 U. S. C. § 902(4) as "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

The Reports also add: "[T]he Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e., a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters." S. Rep., at 13; H. R. Rep., at 11.

We note that there is an apparent inconsistency between the actual wording of § 2(4) and the expression in the legislative history. Section 2(4) defines an "employer" to be the employer of any employee engaged in mari-

The Director and Churchill claim that when Congress added the status requirement in § 3(a), providing that a covered employee must be "engaged in maritime employment," it intended to restrict or define the scope of the increased coverage provided by the expanded situs provision in § 3(a), but that Congress had no intention to exclude from coverage workers, like Churchill, who were injured upon actual navigable waters, *i. e.*, navigable waters as previously defined, in the course of their employment upon those waters.

According to Perini, Congress intended to overrule legislatively this Court's decision in *Calbeck,* and the status requirement was added to ensure that both the landward coverage *and* seaward coverage would depend on the nature of the employee's duties at the time he was injured. Perini's theory, adopted by the court below, is that all coverage under the amended LHWCA requires employment having a "significant relationship to navigation or to commerce on navigable waters." [25] Perini argues further that Churchill cannot meet the status test because he was injured while working on the construction of a foundation for a sewage treatment plant—an activity not typically associated with navigation or commerce on navigable waters.

We agree with the Director and Churchill. We are unable to find any congressional intent to withdraw coverage of the LHWCA from those workers injured on navigable waters in the course of their employment, and who would have been covered by the Act before 1972. As we have long held, "[t]his Act must be liberally construed in conformance with

time employment on the "navigable waters" as defined by the 1972 Amendments to include the expanded landward situs. The legislative history, however, appears to contemplate that a statutory employer must have at least one employee working over the *actual* navigable waters before any employee injured on the new land situs can be covered.

[25] We see no real distinction between the "direct relationship" test used to articulate the "maritime but local" doctrine, and the "significant relationship" test urged by Perini. In support of the use of this test, Perini relies on the "maritime but local" cases.

its purpose, and in a way which avoids harsh and incongruous results." *Voris* v. *Eikel*, 346 U. S. 328, 333 (1953). See also *Baltimore & Philadelphia Steamboat Co.* v. *Norton*, 284 U. S. 408, 414 (1932); *Northeast Marine Terminal Co.*, 432 U. S., at 268.

It is necessary to consider the context in which the 1972 Amendments were passed, especially as that context relates directly to the coverage changes that were effected. Despite the fact that *Calbeck* extended protection of the LHWCA to all employees injured upon navigable waters in the course of their employment, LHWCA coverage still stopped at the water's edge—a line of demarcation established by *Jensen.* In *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212 (1969), we held that the LHWCA did not extend to longshoremen whose injuries occurred on the pier attached to the land. We recognized that there was much to be said for the uniform treatment of longshoremen irrespective of whether they were performing their duties upon the navigable waters (in which case they would be covered under *Calbeck*), or whether they were performing those same duties on a pier. We concluded, however, that although Congress could exercise its authority to cover land-based maritime activity, "[t]he invitation to move that *[Jensen]* line landward must be addressed to Congress, not to this Court." 396 U. S., at 224. See *Victory Carriers, Inc.* v. *Law*, 404 U. S. 202, 216 (1971).

"Congress responded with the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972." *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69, 73 (1979). The 1972 Amendments were enacted after Committees in both the House and Senate prepared full Reports that summarized the general purposes of the legislation and contained an analysis of the changes proposed for each section. See S. Rep., *supra;* H. R. Rep., *supra.* These legislative Reports indicate clearly that Congress intended to "*extend* coverage to protect *additional* workers." S. Rep., at 1 (emphasis

added).[26]   Although the legislative history surrounding the
addition of the status requirement is not as clear as that con-
cerning the reasons for the extended situs, it is clear that
"with the definition of 'navigable waters' expanded by the
1972 Amendments to include such a large geographical area,
it became necessary to describe affirmatively the class of
workers Congress desired to compensate." *Northeast Ma-
rine Terminal Co., supra,* at 264.   This necessity gave rise
to the status requirement: "The Committee does not intend
to cover employees who are not engaged in loading, unload-
ing, repairing, or building a vessel, just because they are in-
jured in an area adjoining navigable waters used for such ac-
tivity."   S. Rep., at 13; H. R. Rep., at 11.   This comment

---

[26] The reasons for the extended landward coverage are set forth in Re-
port sections labeled "Extension of Coverage to Shoreside Areas":

"The present [1927] Act, insofar as longshoremen and ship builders and
repairmen are concerned, covers only injuries which occur 'upon the navi-
gable waters of the United States.'   Thus, coverage of the present Act
stops at the water's edge; injuries occurring on land are covered by State
Workmen's Compensation laws.   The result is a disparity in benefits pay-
able for death or disability for the same type of injury depending on which
side of the water's edge and in which State the accident occurs.

"To make matters worse, most State Workmen's Compensation laws
provide benefits which are inadequate . . . .

.         .          .             .           .

"The Committee believes that the compensation payable to a longshore-
man or a ship repairman or builder should not depend on the fortuitous cir-
cumstance of whether the injury occurred on land or over water.   Accord-
ingly, the bill would amend the Act to provide coverage of longshoremen,
harbor workers, ship repairmen, ship builders, shipbreakers, and other
employees engaged in maritime employment (excluding masters and mem-
bers of the crew of a vessel) if the injury occurred either upon the navi-
gable waters of the United States or any adjoining pier, wharf, dry dock,
terminal, building way, marine railway, or other area adjoining such navi-
gable waters customarily used by an employer in loading, unloading, re-
pairing, or building a vessel.

"The intent of the Committee is to permit a uniform compensation sys-
tem to apply to employees who would otherwise be covered by this Act for
part of their activity. . . ." S. Rep., at 12–13; H. R. Rep., at 10–11.

indicates that Congress intended the status requirement to define the scope of the extended landward coverage.[27]

There is nothing in these comments, or anywhere else in the legislative Reports, to suggest, as Perini claims, that Congress intended the status language to require that an employee injured upon the navigable waters in the course of his employment had to show that his employment possessed a direct (or substantial) relation to navigation or commerce in

---

[27] Perini argues that Congress' intent to eliminate the problem associated with movement from covered to noncovered areas will be frustrated by our holding because some employees may be deemed to satisfy the status test while working upon the navigable waters, but be deemed not to satisfy the status test when performing the same activity on land.

We have had two opportunities to examine the scope of landward coverage under the 1972 Amendments. See *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977), and *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69 (1979). In neither case did we interpret the "maritime employment" status provision to require an examination into whether the employment had a "direct" or "significant relationship to navigation or commerce." Rather, in both cases, we decided that the employees were covered because they were "engaged in longshoring operations," and thus fit one of the categories explicitly enumerated by Congress as part of "maritime employment." See 432 U. S., at 271, 273; 444 U. S., at 82.

We have had no occasion as yet to determine other possible applications of the status test to activities performed on the expanded landward situs. Although we do not maintain that landward coverage could never be determined by reference to anything but the explicitly enumerated categories of activities in the § 2(3) definition of "employee," we note that our cases to date have focused on these explicit categories because the legislative history indicates that Congress intended to extend landward coverage to those specifically included occupations. See S. Rep, at 13; H. R. Rep., at 10–11. See also *Northeast Marine Terminal Co., supra*, at 273. Regardless of the potential difficulties that may arise in the future in applying the status test to land-based injuries, it is clear that in extending coverage landward, Congress sought to make available LHWCA compensation to those who, before the 1972 Amendments, regularly *did* move from covered to noncovered areas, but did not intend to withdraw coverage from those employees, traditionally covered by the Act, who were injured in the course of their employment on navigable waters as previously defined.

order to be covered. Congress was concerned with injuries on land, and assumed that injuries occurring on the actual navigable waters were covered, and would remain covered.[28] In discussing the added status requirement, the Senate Report states explicitly that the "maritime employment" requirement in § 3(a) was not meant to "exclude other employees traditionally covered." S. Rep., at 16. We may presume "that our elected representatives, like other citizens, know the law," *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979), and that their use of "employees tradi-

---

[28] Ignoring the references in the Committee Reports to the fact that in 1972 Congress merely sought to extend benefits landward, the dissent focuses instead on passages in the legislative history which indicate that Congress wanted to extend benefits to certain employees who regularly *did* (in Congress' view) walk in and out of coverage, and who performed the same tasks on land as they performed over the actual navigable waters. The dissent concludes from this that Congress sought to withdraw coverage from those employees injured over the actual navigable waters in the course of employment who would have been covered before 1972 and who we now hold are "engaged in maritime employment" for purposes of the amended LHWCA. The fact that Congress desired to extend coverage landward for a certain group of employees does not tend to prove that Congress sought to withdraw coverage from another group of employees who were customarily covered before the 1972 Amendments. The dissent's view would relegate a number of employees to state compensation remedies in the face of express and extensive congressional findings that "most State Workmen's Compensation laws provide benefits which are inadequate." S. Rep., at 12–13; H. R. Rep., at 10.

The dissent claims that it "cannot find a single word" in the legislative history to support LHWCA coverage of any employee who is not a longshoreman or harbor worker. *Post*, at 330. The word that the dissent overlooks is "maritime" in § 2(3) of the Act. Before 1972, employees such as Churchill were considered to be engaged in "maritime" employment. In order to withdraw coverage from employees, such as Churchill, who are maritime employees injured in the course of their employment upon the actual navigable waters, Congress would have had to ignore the consistent interpretation given the Act before 1972, by the Director, the Deputy Commissioners, the courts, and the commentators. See n. 21, *supra*.

tionally covered" was intended to refer to those employees included in the scope of coverage under *Parker, Davis,* and *Calbeck.*[29]

Other aspects of the statutory scheme support our understanding of the "maritime employment" status requirement. Congress removed from § 3(a) the requirement that, as a prerequisite to federal coverage, there can be no valid recovery under state law.[30] As we noted in our discussion in Part

---

[29] Perini cites our decision in *Executive Jet Aviation, Inc.* v. *City of Cleveland,* 409 U. S. 249 (1972), and argues that the LHWCA is premised upon admiralty jurisdiction, which requires a connection between an employee and traditional maritime activity. Perini's reliance on *Executive Jet* is misplaced. In that case, the only issue before the Court was whether federal admiralty jurisdiction extended to tort claims arising out of the crash of an airplane into navigable waters on a flight "within the continental United States, which [is] principally over land." *Id.,* at 266. Jurisdiction in *Executive Jet* was predicated on 28 U. S. C. § 1333(1), which provides that the federal district courts have original and exclusive jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction."

The explicit language of *Executive Jet* makes it clear that our discussion was occasioned by "the problems involved in applying a locality-alone test of admiralty tort jurisdiction to the crashes of aircraft" in a situation where "the fact that an aircraft happens to fall in navigable waters, rather than on land, is wholly fortuitous." 409 U. S., at 265, 266. Although the term "maritime" occurs both in 28 U. S. C. § 1333(1) and in § 2(3) of the Act, these are two different statutes "each with different legislative histories and jurisprudential interpretations over the course of decades." *Boudreaux* v. *American Workover, Inc.,* 680 F. 2d 1034, 1050 (CA5 1982) (footnote omitted). In addition, Churchill, as a marine construction worker, was by no means "fortuitously" on the water when he was injured.

[30] The dissent argues that it is "now perfectly clear" that Churchill (or any other "shore-based worker" injured upon actual navigable waters) could have received a state compensation award, and there should be no concern about such an employee being left without a remedy. This position is by no means "perfectly clear." See, *e. g., Holcomb* v. *Robert W. Kirk and Associates, Inc.,* 655 F. 2d 589 (CA5 1981) (watchman injured while working on vessel sought compensation under state scheme, and was denied recovery because injury was covered under LHWCA—Court of Appeals granted LHWCA compensation, holding that when Congress passed the 1972 Amendments, it took for granted that injuries occurring on the actual

III–A, *supra,* the continued use of the "maritime but local" doctrine occurred after passage of the 1927 Act because the original coverage section contained this requirement that Congress explicitly deleted in 1972. Surely, if Congress wished to repeal *Calbeck* and other cases legislatively, it would do so by clear language and not by removing from the statute the exact phrase that *Calbeck* found was responsible for continued emphasis on the "maritime but local" doctrine.[31]

Congressional intent to adhere to *Calbeck* is also indicated by the fact that the legislative Reports clearly identified those decisions that Congress wished to overrule by the 1972 Amendments. As mentioned above, the 1972 Amendments had other purposes apart from an expansion of coverage to shoreside areas. Two other purposes involved the elimination of a strict-liability unseaworthiness remedy against a vessel owner afforded to longshoremen by *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946), and an indemnity claim against the stevedore by the vessel owner afforded by *Ryan*

---

navigable waters were covered under *Parker, Davis, Pennsylvania R. Co., Calbeck,* and the myriad lower court cases applying our decisions); *Rex Investigative and Patrol Agency,* 329 F. Supp., at 698 (the court found that the injured watchman's state compensation claim had been dismissed because the "claim properly belonged before a federal, rather than a [New York] state, agency").

[31] Certain comments made in the debates preceding passage of the 1972 Amendments in the House indicate support for our view that Congress intended to extend protection in 1972, and not to withdraw protection. For example, Representative Steiger posed the following question and answer to explain the coverage provision:

"Q. *The present law covers employees working on navigable waters. Do the amendments change the scope of coverage?*

"A. Yes. The present law's coverage is limited to employees working on navigable waters, including those working on dry docks. The amendments will extend coverage to wharfs, terminals, marine railways and other adjoining areas . . . ." 118 Cong. Rec. 36385 (1972) (emphasis in original).

See also *id.,* at 36270–36271 (remarks of Sen. Williams); *id.,* at 36381–36382 (remarks of Rep. Daniels).

*Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U. S. 124 (1956). The legislative Reports explicitly identified these decisions as intended to be overruled legislatively by the 1972 Amendments. See S. Rep., at 8–12; H. R. Rep., at 4–8. It is, therefore, highly unlikely that Congress would have intended to return to the "jurisdictional monstrosity" that *Calbeck* sought to lay to rest without at least some indication of its intent to do so.

In considering the scope of the status test as applied to land-based employees in *Northeast Marine Terminal Co.*, we rejected the "point of rest" theory proposed by the employer, under which landward coverage under the 1972 Amendments would include only the portion of the unloading process that takes place before longshoremen place the cargo onto the dock. We reasoned that the "point of rest" concept is "[a] theory that nowhere appears in the Act, that was never mentioned by Congress during the legislative process, that does not comport with Congress' intent, and that restricts the coverage of a remedial Act designed to extend coverage . . . ." The absence of the concept, "claimed to be so well known in the industry is both conspicuous and telling." 432 U. S., at 278–279, 275. In the same sense, the absence of even the slightest congressional allusion to the "maritime but local" doctrine, a concept that plagued maritime compensation law for over 40 years and that would have the effect of restricting coverage in the face of congressional intent not to "exclude other employees traditionally covered," is equally conspicuous and telling.

Finally, we note that our conclusion concerning the continued coverage of employees injured on actual navigable waters in the course of their employment is consistent with, and supported by, our recent decision in *Sun Ship, Inc.* v. *Pennsylvania*, 447 U. S. 715 (1980). In *Sun Ship*, the issue before the Court was whether extended shoreside coverage under the 1972 Amendments had the effect of displacing con-

current state remedies for landward injuries. After a review of the development of the "maritime but local" doctrine, and review of certain portions of the legislative history of the 1972 Amendments, we concluded that those Amendments were not intended to resurrect the dilemma, created by mutually exclusive spheres of jurisdiction, that *Calbeck* and *Davis* eliminated. Our reasoning was based, in part, on the removal by Congress of the language in the 1927 Act that made federal compensation available if recovery could not validly be provided by state law: "[T]he deletion of that language in 1972—if it indicates anything—may logically only imply acquiescence in *Calbec[k]* . . . ." 447 U. S., at 721.

*Sun Ship* held that with respect to land-based injuries, "the . . . extension of federal jurisdiction supplements, rather than supplants, state compensation law." *Id.*, at 720. If we were to hold that the addition of the status requirement was meant to exclude from coverage some employees injured on the actual navigable waters in the course of their employment, a most peculiar result would follow. Concurrent jurisdiction will exist with respect to the class of employees to whom Congress extended protection in 1972, while employees "traditionally covered" before 1972 would be faced with a hazardous pre-*Davis* choice of two exclusive jurisdictions from which to seek compensation. Such an anomalous result could not have been intended by Congress. We also note that a return to exclusive spheres of jurisdiction for workers injured upon the actual navigable waters would be inconsistent with express congressional desire to extend LHWCA jurisdiction landward in light of the inadequacy of most state compensation systems. See S. Rep., at 12; H. R. Rep., at 10.

In holding that we can find no congressional intent to affect adversely the pre-1972 coverage afforded to workers injured upon the actual navigable waters in the course of their employment, we emphasize that we in no way hold that Con-

gress meant for such employees to receive LHWCA coverage merely by meeting the situs test, and without any regard to the "maritime employment" language.[32]  We hold only that when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3), and is covered under the LHWCA, providing, of course, that he is the employee of a statutory "employer," and is not excluded by any other provision of the Act.[33]  We consider these employees to be "engaged in maritime employment" not simply because they are injured in a historically maritime locale, but because they are required to perform their employment duties upon navigable waters.[34]

[32] In both *Northeast Marine Terminal Co.*, 432 U. S., at 263–264, and *P. C. Pfeiffer Co.*, 444 U. S., at 78–79, we recognized that the status requirement is occupational and the situs test is geographic.

[33] See also, *e. g.*, 1A E. Benedict, Admiralty §§ 17, 19 (7th rev. ed. 1982); Gilmore & Black, at 428–430; Robertson, Injuries to Maritime Petroleum Workers: A Plea for Radical Simplification, 55 Texas L. Rev. 973, 986–987 (1977); Comment, Broadened Coverage under the LHWCA, 33 La. L. Rev. 683, 694 (1973); Note, 54 N. C. L. Rev. 925, 940 (1976).  But see 4 A. Larson, Law of Workmen's Compensation §§ 89.27, 89.41 (1982); Tucker, Coverage and Procedure under the Longshoremen's and Harbor Workers' Compensation Act Subsequent to the 1972 Amendments, 55 Tulane L. Rev. 1056, 1062 (1981).

[34] Our holding, of course, extends only to those persons "traditionally covered" before the 1972 Amendments.  We express no opinion whether such coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters, or to a land-based worker injured on land who then falls into actual navigable waters.  Our decision today should not be read as exempting water-based workers from the new status test.  Rather, our holding is simply a recognition that a worker's performance of his duties upon actual navigable waters is necessarily a very important factor in determining whether he is engaged in "maritime employment."

Contrary to the suggestion by the dissent, *post*, at 342–343, n. 26, there is no inconsistency in our failing to decide the question of coverage as to these employees, and our reliance on *Parker*.  In *Parker*, we held that the injured employee was engaged in "maritime employment" in a situation where we did not discuss whether the employer was a statutory "employer."

## IV

In conclusion, we are unable to find anything in the legislative history or in the 1972 Amendments themselves that indicate that Congress intended to withdraw coverage from employees injured on the navigable waters in the course of their employment as that coverage existed before the 1972 Amendments. On the contrary, the legislative history indicates that Congress did not intend to "exclude other employees traditionally covered." Moreover, Congress explicitly deleted the language from § 3(a) that we found in *Calbeck* to be responsible for the "jurisdictional dilemma" caused by two mutually exclusive spheres of jurisdiction over maritime injuries. Accordingly, the decision of the Court of Appeals is hereby reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, concurring in the judgment.

At the time of his injury, Churchill was engaged in unloading materials from a supply barge to a cargo barge. This work is very much like the work of longshoremen, who typically load and unload vessels. Therefore Churchill was "engaged in maritime employment" within the meaning of § 2(3) of the Act, and was within its coverage. Accordingly, I concur in the judgment of the Court.

JUSTICE STEVENS, dissenting.

Neither the legislative history nor the judicial history on which the Court relies today justifies a departure from the language of the statute defining the post-1972 coverage of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). Indeed, when the issue is viewed in its proper historical perspective, it becomes even more clear that a literal reading of the Act will avoid anomalies that troubled Congress in 1972 as well as unnecessary litigation and dupli-

cate insurance coverage in the post-1972 period.  I shall first comment on the statutory language and then discuss its history.

## I

The principal focus of the statute is identified by its title as well as its text.  It provides workers' compensation benefits for injuries to longshoremen and harbor workers.[1]  The coverage of the statute is defined by two basic tests—a *situs* test focusing on the place where the injury occurred, and a *status* test focusing on the character of the injured employee's occupation.  An injured person is entitled to compensation under the Act only if he satisfied both tests at the time of the injury.  The two tests work together to provide comprehensive coverage for a large class of workers who perform hazardous longshore and ship repair work.

The requisite occupational status is defined in § 2(3) of the Act.  It provides:

---

[1] By reason of several specific statutory enactments, the LHWCA's compensation scheme is, or has been, also applied to:

(a) employees on defense bases, Act of Aug. 16, 1941, ch. 357, § 1, 55 Stat. 622 (codified, as amended, at 42 U. S. C. §§ 1651–1654);

(b) employees of nonappropriated fund instrumentalities such as post exchanges, Act of June 19, 1952, Pub. L. 397, § 2, 66 Stat. 139 (codified, as amended, at 5 U. S. C. §§ 8171–8173);

(c) employees of Government contractors injured overseas by war-risk hazards, Act of Dec. 2, 1942, ch. 668, Title I, § 102, 56 Stat. 1031 (codified, as amended, at 42 U. S. C. § 1702);

(d) workers in the District of Columbia, Act of May 17, 1928, ch. 612, 45 Stat. 600, repealed by Act of July 1, 1980, D. C. Law 3–77, § 3, see D. C. Code § 36–301 (1981); and

(e) workers on oil drilling rigs on the Outer Continental Shelf, Act of Aug. 7, 1953, Pub. L. 212, § 4(c), 67 Stat. 463 (codified, as amended, at 43 U. S. C. § 1333(c)).

In this case, however, we are concerned with the coverage provided by the LHWCA itself.

"The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U. S. C. § 902(3).

The term "maritime employment" expressly includes two important subcategories, both of which are defined with reasonable clarity. The question of construction that is presented is what, if any, additional categories of employment are included within the term "maritime employment." There are several independent reasons for not giving the term an expansive, essentially open-ended reading.

First, one of the oldest and most respected rules of statutory construction teaches us that general terms should be construed in the light of the specific examples that are expressly identified as included therein. In this statute, the subcategories—longshoremen and harbor workers—are both described in detail, and no other subcategory is even mentioned, giving rise to an especially strong inference that Congress intended a snug fit between "maritime employment" and the two subcategories.[2]

This inference is corroborated by the fact that Congress took the trouble to add language making it clear that the stat-

---

[2] Coincidentally, two authors named Sutherland have made this point in language that is strikingly suitable to this case. See W. Sutherland, The Shipbuilder's Assistant 77 (1755) ("[T]he straiter and *snuger* the Sheer lies, the less Wind is held to hinder the Motion of the Ship") (emphasis added); J. Sutherland, Statutes and Statutory Construction § 273 (1891) (footnote omitted) ("The words 'other persons,' following in a statute the words 'warehousemen' and 'wharfinger,' must be understood to refer to other persons *ejusdem generis*, viz., those who are engaged in a like business, or who conduct the business of warehousemen or wharfingers with some other pursuit, such as shipping, grinding, or manufacturing").

utory concept of "maritime employment" was not intended to describe either the master or a member of the crew of any vessel.[3]   In short, the ordinary meaning of the words "maritime employment" is actually excluded from the description of the occupational categories that Congress intended the LHWCA to cover.

It is also clear that the definition of "employee" is entirely unaffected by where he may be injured; if a worker is not an "employee" when ashore, he is not an "employee" when afloat.   Therefore, it is critically significant that the definition of where "employees" are covered—the situs provision—reveals the same limited concern for the same key occupations as the status provision.   An "employee" is covered only while on navigable waters and on "any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area *customarily used by an employer in loading, unloading, repairing, or building a vessel.*"   33 U. S. C. § 903(a) (emphasis added).

If we ignore history, and merely concentrate on the text of this statute, the conclusion is inescapable that it merely provides coverage for people who do the work of longshoremen and harbor workers—amphibious persons who are directly involved in moving freight onto and off ships, or in building, repairing, or destroying ships.   A "checker" is such a worker.[4]   So are "terminal laborers," *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977), "cotton headers," *P. C. Pfeiffer Co.* v. *Ford*, 444 U. S. 69 (1979), and "warehousemen," *ibid.*   A construction worker on a sewage treatment plant plainly lacks this direct link to maritime commerce, regardless of where he may have been working at the time of his injury.

---

[3] Seamen are protected under the Jones Act.   See 46 U. S. C. § 688.

[4] See H. R. Rep. No. 92–1441, p. 11 (1972); S. Rep. No. 92–1125, p. 13 (1972); *Northeast Marine Terminal Co.* v. *Caputo*, 432 U. S. 249 (1977).

## II

If we examine the legislative history of the 1972 Amendments [5]—without regard to the text of the statute or judicial

[5] The 1972 Amendments made two changes that are relevant here. First, they modified the definitions in 33 U. S. C. §§ 902(3) and 902(4). Before the Amendments, the definitions read:

"(3) The term 'employee' does not include a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

"(4) The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)." §§ 902(3), (4) (1970 ed.).

As amended in 1972, the definitions read:

"(3) The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

"(4) The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

Second, the Amendments modified the section defining covered injuries, 33 U. S. C. § 903(a). Before the Amendments, it read:

"Compensation shall be payable under this Act in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—

"(1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or

"(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof." § 903(a) (1970 ed.).

*[Footnote 5 is continued on p. 330]*

decisions that are unmentioned in that history—we must reach the same conclusion. I cannot find a single word[6] in the Committee hearings, the Committee Reports, or the legislative debates that even suggests that any Congressman or Senator believed that the statute provided coverage for anyone other than longshoremen, harbor workers, and persons in the entirely separate categories that had been included by special statutory enactment.[7]

As amended in 1972, the section reads:

"Compensation shall be payable under this Act in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). No compensation shall be payable in respect of the disability or death of—

"(1) A master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or

"(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof." 86 Stat. 1251, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972.

[6] The Court assumes that the words "traditionally covered" in the Committee Reports are intended to refer to employees who are not longshoremen or harbor workers. *Ante,* at 319, quoting S. Rep. No. 92–1125, at 16. See n. 1, *supra.* In particular, the Court assumes that the Committee was referring to the claimants in *Parker* v. *Motor Boat Sales, Inc.,* 314 U. S. 244 (1941), *Davis* v. *Department of Labor,* 317 U. S. 249 (1942), and *Calbeck* v. *Travelers Insurance Co.,* 370 U. S. 114 (1962). As I point out in Part III, *infra,* the *Calbeck* claimants were shipbuilders, a subcategory of the statutorily defined class of harbor workers, who are of course still covered under the 1972 Act; *Davis* held only that the claimant was entitled to state benefits; and *Parker* was plainly not a "traditional" LHWCA case. None of these cases was cited at any time in the hearings or the Reports. In my opinion the reference to the "traditional" coverage of the Act was intended to identify the coverage of longshoremen and harbor workers as opposed to the special categories of coverage defined by specific statutory enactment.

[7] See n. 1, *supra.*

At the opening of the House Subcommittee hearings, Congressman Daniels explained his understanding of the existing scope of the LHWCA [8] and the need for amendments:

> "This Act provides workmen's compensation protection to longshoremen, ship repairmen, harbor workers at U. S. defense bases outside the United States and workers employed in private industry in the District of Columbia.
>
> "Amendments to the Longshoremen's and Harbor Workers' Compensation Act are long overdue. Benefits under this act have not been increased for 12 years, and the cost to the injured workers of inadequate benefits has become a serious matter.
>
> "For example, the law now allows a totally disabled worker to receive two-thirds of his average weekly wages at the time of his injury. However, since 1961 there has been a limitation of $70 per week as the maximum payment for a permanent disability. This statutory maximum results in a substantially lower payment than two-thirds of the weekly wage for most longshoremen and District of Columbia workers covered by this statute.
>
> "More than 270,000 longshoremen and ship repairmen are covered by this statute. In addition, another 300,000 employees of private employers within the District of Columbia are protected by this law as well as an additional 200,000 workers in defense bases and work on Outer Continental Shelf projects.

---

[8] None of the original bills proposing amendments to the LHWCA in 1972 embodied any change in the scope of coverage. See H. R. 247; H. R. 3505; H. R. 12006; H. R. 15023; S. 2318; S. 525; S. 1547 (all in 92d Cong., 2d Sess.). The changes were incorporated between the hearings and the final Committee action. See H. R. 12006; S. 2318 (as reported). The hearings are nonetheless relevant because they give more direct evidence of what groups the legislators intended to protect than does the history of pre-1972 Supreme Court decisions.

332

"Last year, there were more than 109,000 injuries
under this statute; 240 of them fatal, 68,000 of them re-
lated to longshore work, and another 27,000 involved
District of Columbia workers." Hearings on H. R. 247
et al. before the Select Subcommittee on Labor of the
House Committee on Education and Labor, 92d Cong.,
2d Sess., 46 (1972) (hereinafter House Hearings).

Throughout the hearings, the legislators were told over and
over again how important it was to increase the Act's bene-
fits for workers in the categories identified by Congressman
Daniels.[9]   It seems plain that these were the categories of
employment that were understood by Congress to define the
traditional coverage of the Act.

When the House and Senate Committees reported out
their respective bills, they had granted the sought-after in-
crease in benefits.   They had also amended the provisions
defining the scope of coverage, including the language of
"status" and "situs" discussed in the previous section.   They
had done so in response to a problem in the scope of prior cov-
erage.   Before 1972, longshoremen's and harbor workers'
federal coverage had stopped at the water's edge.   Because
their duties regularly took them off the vessel and onto the

---

[9] *E. g.*, Statement of James Hodgson, Secretary of Labor, House Hear-
ings, at 47–64 (referring throughout to "longshoremen" and the "longshore
industry"); Statement of Ralph Hartman, Bethlehem Steel Corp., *id.*, at 67
("reference to the Longshoremen's and Harbor Workers' Compensation
Act seems to suggest that the only industry involved is 'longshoring,'
which fails to recognize that the act is also applicable to shipbuilding and
ship repair yards—and to the District of Columbia"); Exhibits D1, D2, E,
and F to Statement of James Flynn, New York Shipping Association, *id.*,
at 98–100 (pointing out how hazardous longshoring is); Statement of How-
ard McGuigan, AFL–CIO, *id.*, at 255–258 (pointing out how LHWCA
benefits were far below 66⅔% of current wage levels in the longshore in-
dustry, in the shipbuilding and ship repair industry, and in the District of
Columbia).   Cf. Statement of John J. O'Donnell, Air Line Pilots Asso-
ciation, *id.*, at 327–329 (suggesting that coverage be extended to flight
crews).

pier, they were constantly "walking in and out of coverage." On the House side, Joseph Leonard, the international safety director of the International Longshoremen's Association, spoke about the hardship this system imposed:

> "Federal compensation law stops at the gangplank to the pier. When you come off of the gangplank you come under a different law; you come under the State. Thirty-six States cover these docks and maybe more now with the inland waterways.
>
> "The longshoremen are the only workers in the United States who must worry about their injury to determine the compensation. . . . It is time for a Federal law for compensation for all longshoremen." *Id.*, at 297.

And on the Senate side, the Minority Counsel brought this problem to the Senators' attention.[10]

---

[10] The Minority Counsel, Eugene Mittelman, had the following exchange with a representative of the AFL–CIO:

"Mr. MITTELMAN. My last question concerns the fact that the longshoreman *[sic]* applies only when the man is over the navigable waters of the United States, and under whole series of court decisions there has been established a line where the provisions of the Longshore Act apply when the man is over the water, and yet the provisions of the State workmen's compensation law applies if the man is injured on land.

.      .      .      .      .

"Do you have any position on this, concerning whether the Federal law should be extended, really, so that a uniform system of benefits is applicable to longshoremen, regardless of which side of the waterline the injury occurred on?

"Mr. MCGUIGAN. The first position we would have is that obviously there would be no incentive to cover him under the act until we know the act gives him benefits superior to the State workmen's compensation laws.

"Mr. MITTELMAN. I appreciate that. But assuming we would amend the act to provide a reasonable schedule of benefits as proposed in this bill, would you favor the principle of extending of the Longshore Act to cover all longshore workers whether performed on land or over water?

.      .      .      .      .

"Mr. O'BRIEN . . . . [I]f the act were amended to take up its former place of prominence in the field of workmen's compensation, we would certainly

334

The Committee amendments responded to this problem by defining the protected situs to encompass the entire area in which members of the protected class customarily perform their regular duties. This definition of situs clearly precludes coverage for a construction worker standing on a sewage treatment plant or a bridge. Yet if one accepts the view of the claimant in this case, the statute grants him coverage while aboard a floating vessel and therefore expects him to walk in and out of coverage during a typical workday. Such a view is flatly inconsistent with the explicit intent of Congress to "permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for [only] part of their activity." H. R. Rep. No. 92–1441, pp. 10–11 (1972); S. Rep. No. 92–1125, p. 13 (1972).[11] Only if

like to see the coverage of the act extended." Hearings on S. 2318 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess., 73–74 (1972).

[11] The language of the Committee Reports shows how clearly Congress understood who was to be covered:

"The present Act, insofar as longshoremen and ship builders and ship repairmen are concerned, covers only injuries which occur 'upon the navigable waters of the United States.' Thus, coverage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs.

.       .       .       .       .

"The Committee believes that the compensation payable to a longshoreman or a ship repairman or a builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel." H. R. Rep. No. 92–1441, at 10; S. Rep. No. 92–1125, at 12–13.

we adhere to the language used by Congress to define the relevant status harmoniously with the relevant situs can the congressional purpose be achieved.

## III

The pre-1972 judicial history of the LHWCA confirms my construction of the 1972 Amendments and also explains why the work of longshoremen and harbor workers is described as "maritime employment" in the statute. Only once during the 45-year interval between the enactment of the LHWCA in 1927 and its amendment in 1972, in *Parker* v. *Motor Boat Sales, Inc.*, 314 U. S. 244 (1941), did this Court uphold an award of benefits under the LHWCA for a worker who was neither a longshoreman nor a harbor worker.[12] That lonely decision rested on a concern that is no longer significant, and surely provides an insufficient predicate for the Court's all-inclusive interpretation of "maritime employment." Before commenting specifically on the *Parker* case, however, I shall briefly identify the two principal chapters in the pre-1972 history of the LHWCA.

The first chapter (which covers the period from 1917 to 1927) explains why there was a need for federal legislation to provide compensation for injured longshoremen and harbor workers. Prior to 1917, it was assumed that these workers were adequately protected by whatever state legislation existed. In that year, however, this Court held that the na-

---

[12] Arguably one other case, mentioned in a footnote of the Court's opinion, *ante*, at 312, n. 21, echoed *Parker*'s broad construction of the scope of LHWCA coverage. *Pennsylvania R. Co.* v. *O'Rourke*, 344 U. S. 334 (1953). There, this Court struck down an award of benefits under the Federal Employers' Liability Act, reasoning that the employee in that case—a brakeman who worked moving freight cars onto "car floats"—could have recovered under the LHWCA. The opinion in *O'Rourke* is somewhat cloudy, however, since it does not explicitly state that the particular employee was engaged in maritime employment, but only that his employer had such employees. *Id.*, at 339–340. Like the cases on which the Court relies, *O'Rourke* was not mentioned in the 1972 legislative history.

tional interest in the uniform regulation of maritime commerce precluded state jurisdiction over injuries occurring on navigable waters. *Southern Pacific Co.* v. *Jensen*, 244 U. S. 205 (1917).[13]

Over the classic dissents of two of our greatest Justices, the Court adhered to that view even though Congress twice attempted to authorize the exercise of state jurisdiction over these "maritime" injuries.[14] The so-called "*Jensen* line" thus developed as a constitutional limit on the exercise of state power over maritime employment.

The reasoning of the *Jensen* case originally appeared to foreclose the application of state workmen's compensation schemes to any injury occurring on navigable waters. The Court soon made it clear, however, that there was a somewhat vaguely defined area—an area that became known as the "maritime but local" area—in which state jurisdiction survived. Thus, in 1922, five years before the enactment of the LHWCA, the Court held that a carpenter injured at work aboard an uncompleted ship that had been launched in the Willamette River could recover under the Oregon Workmen's Compensation Law. *Grant Smith-Porter Ship Co.* v.

---

[13] The Court reasoned:

"The work of a stevedore in which the deceased was engaging is maritime in its nature; his employment was a maritime contract; the injuries which he received were likewise maritime; and the rights and liabilities of the parties in connection therewith were matters clearly within the admiralty jurisdiction.

"If New York can subject foreign ships coming into her ports to such obligations as those imposed by her Compensation Statute, other States may do likewise. The necessary consequence would be destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; and freedom of navigation between the States and with foreign countries would be seriously hampered and impeded." 244 U. S., at 217 (citation omitted).

[14] See *id.*, at 218–223 (Holmes, J., dissenting); *Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149, 166–170 (1920) (Holmes, J., dissenting); *Washington* v. *W. C. Dawson & Co.*, 264 U. S. 219, 228–239 (1924) (Brandeis, J., dissenting).

*Rohde*, 257 U. S. 469 (1922). The national interest in uniformity that had been considered paramount in *Jensen* was not thought to be materially prejudiced by Oregon's regulation of "certain local matters." [15]

Unlike the work of the carpenter in *Rohde*, the work of the longshoreman was considered by the Court to have a character that required regulation by a uniform federal scheme. That much was made clear by the Court's opinion in *Northern Coal and Dock Co.* v. *Strand*, 278 U. S. 142 (1928), [16] a case involving a fatal shipboard injury to a longshoreman.

> "The unloading of a ship is not a matter of purely local concern. It has direct relation to commerce and navigation, and uniform rules in respect thereto are essential. The fact that Strand worked for the major portion of the time upon land is unimportant. He was upon the water in pursuit of his maritime duties when the accident occurred." *Id.*, at 144.

The LHWCA was enacted in 1927 to remedy this inability of the States to provide adequate protection for longshoremen injured on navigable waters. The fact that these workers had been characterized as "maritime" in the cases that had denied them adequate state protection explains why Congress later used the same term in the LHWCA.

The second chapter (which covers the period from 1927 to 1972) explains why it was necessary for Congress to limit the

---

[15] In explaining why the holding in *Rohde* was consistent with *Jensen* and subsequent cases, the Court stated:

"In each of them the employment or contract was maritime in nature and the rights and liabilities of the parties were prescribed by general rules of maritime law essential to its proper harmony and uniformity. Here the parties contracted with reference to the state statute; their rights and liabilities had no direct relation to navigation, and the application of the local law cannot materially affect any rules of the sea whose uniformity is essential." 257 U. S., at 477.

[16] The *Strand* case was decided in 1928 but arose out of an injury that had occurred in 1924, prior to the enactment of the LHWCA.

coverage of the LHWCA to a defined category of employees. As originally enacted in 1927, the LHWCA was merely intended to fill the gap in state coverage that had been created by *Jensen* and its progeny.[17] The provision that defined the scope of coverage, § 903(a) (which remained unchanged until 1972), purported to exclude federal coverage if recovery may "validly be provided by State law." At first, the statutory language was taken literally, and state and federal coverage were thought to be purely complementary and mutually exclusive. See *Crowell* v. *Benson*, 285 U. S. 22, 39, and n. 3 (1932). But given the imprecision of the *Jensen-Rohde* line, that system risked serious unfairness: If an injured employee asked for state benefits and was seaward of the line, a literalist interpretation of the LHWCA would bar recovery. An employee close to the line might easily misguess, miss the statute of limitations, and end up with no benefits at all.

This Court responded to this potential for injustice in two ways. Notwithstanding the plain language of the statute which purported to describe mutually exclusive spheres of state and federal jurisdiction,[18] the Court first upheld a state award in a case in which it was assumed that the federal statute would also apply, *Davis* v. *Department of Labor*, 317 U. S. 249 (1942), and then upheld a federal award in a case in which the Court assumed that recovery could "validly be pro-

---

[17] "The main impetus for the Longshoremen's and Harbor Workers' Compensation Act was the need to correct a gap made plain by decisions of this Court. We believe that there is only one interpretation of the proviso in § 3(a) which would accord with the aim of Congress; the field in which a state may not validly provide for compensation must be taken, for the purposes of the Act, as the same field which the *Jensen* line of decision excluded from state compensation laws. Without affirming or rejecting the *constitutional* implications of those cases, we accept them as the measure by which Congress intended to mark the scope of the Act they brought into existence." *Parker* v. *Motor Boat Sales, Inc.*, 314 U. S., at 250.

[18] See *Davis* v. *Department of Labor*, 317 U. S., at 261 (Stone, C. J., dissenting); *Calbeck* v. *Travelers Insurance Co.*, 370 U. S., at 132 (Stewart, J., dissenting).

vided by State law." *Calbeck* v. *Travelers Insurance Co.*, 370 U. S. 114 (1962).[19]  But the Court's mechanism for ensuring that no employee would go entirely unprotected created a twilight zone of overlapping jurisdiction in which many employers were required to obtain duplicate insurance coverage.[20]  Moreover, the practice of defining coverage entirely by reference to the place where an accident occurred gave rise to the anomalous circumstance that longshoremen regularly walked in and out of coverage during the performance of their routine duties.

Whatever force the *Jensen* rule may once have had, it is now perfectly clear that a shore-based worker who is normally covered by a state compensation program may still recover state benefits even though he is injured over navigable waters.  Surely no Member of this Court would question the

---

[19] The Court relies heavily on the proposition that Congress did not wish "to repeal *Calbeck*" (*ante*, at 321).  It is, of course, true that the claimants in that case are still covered by the Act.  What Congress repealed was the statutory language that appeared to preclude coverage for harbor workers like the *Calbeck* claimants who were injured in the maritime but local area. The problem confronted by the Court in *Calbeck* simply no longer exists.

[20] In 1942, this Court observed:

"The horns of the jurisdictional dilemma press as sharply on employers as on employees.  In the face of the cases referred to above, the most competent counsel may be unable to predict on which side of the line particular employment will fall.  The employer's contribution to a state insurance fund may therefore wholly fail to protect him against the liabilities for which it was specifically planned.  If this very case is affirmed, for example, the employer will not only lose the benefit of the state insurance to which he has been compelled to contribute and by which he has thought himself secured against loss for accidents to his employees; he must also, by virtue of the conclusion that the employee was subject to the federal act at the time of the accident, become liable for substantial additional payments.  He will also be subject to fine and imprisonment for the misdemeanor of having failed, as is apparently the case, to secure payment for the employee under the federal act.  33 U. S. C. §§ 938, 932." *Davis*, 317 U. S., at 255.

On that point, the dissenter was in complete agreement.  See *id.*, at 262 (Stone, C. J., dissenting).

fact that the construction worker injured in this case could have received a state award even though he was on a barge in the Hudson River when he was injured. The concern about the inability of the States to protect land-based workers who may temporarily cross the *Jensen* line is no longer significant—surely that concern provided no motivation whatsoever for the action Congress took in 1972 when it amended the LHWCA.

On the other hand, the 1972 Congress clearly did have reason to be concerned about the cost of duplicate insurance coverage and the unpredictability of coverage that depends entirely on the happenstance of where an accident occurs. As I have mentioned above,[21] the unpredictability of coverage was mentioned explicitly in the legislative history. And the burdens of duplicate insurance for employees who might occasionally walk into federal coverage became substantially more onerous as a result of the 1972 changes that made federal LHWCA benefits significantly higher than state workers' compensation benefits.[22] Both of these concerns are alleviated by defining the scope of the statutory coverage in terms of the *status* of the covered employee. And both of these concerns can only be aggravated by indiscriminately

---

[21] See *supra*, at 332–334.

[22] Before 1972, the financial burden of duplicate coverage had not been particularly heavy. LHWCA benefits were low, and insurance carriers offered to cover operations subject to the LHWCA for only a nominal addition to the state workers' compensation premiums. See Note, 50 Calif. L. Rev. 342, 347 (1962); Comment, 30 NACCA L. J. 200, 203, 206 (1964); Gardner, Remedies for Personal Injuries to Seamen, Railroadmen, and Longshoremen, 71 Harv. L. Rev. 438, 449–450, and n. 34 (1958).

Today, of course, things are quite different. In 1981, LHWCA premiums averaged 252 percent higher than California construction worker premiums, and 160 percent higher than Florida premiums. See Testimony of the Associated General Contractors of America, Hearings on S. 1182 before the Subcommittee on Labor of the Senate Committee on Labor and Human Resources, 97th Cong., 1st Sess., 924–936 (1981).

extending coverage to an undefined group of workers who plainly do not "load, unload, build, or repair ships."

All that remains to support the Court's rewriting of the statute is the absence of an expressed intent to withdraw pre-1972 coverage. As I have already noted, that intent is adequately demonstrated by the changes in the text of the statute itself.[23] Even if that were not sufficient, however, the Court is really objecting to nothing more than a failure to mention a single case decided in 1942—*Parker* v. *Motor Boat Sales, Inc.*—during the hearings or the debates. But when one considers the highly unusual facts of that case, it is unlikely that any Member of Congress had it in mind and virtually inconceivable that Congress would have wanted to provide federal coverage for similar future cases. The employee in the *Parker* case—a janitor for a small boat concern located on the James River—was not protected by a state workmen's compensation program for a reason that had nothing to do with the character of his employment or the place of his injury. The employer did not have the minimum number of employees to bring it under the Virginia statute. See *Motor Boat Sales, Inc.* v. *Parker*, 116 F. 2d 789, 793 (CA4 1941). The happenstance that the janitor was riding in a motorboat at the time of his injury enabled the Court to find a basis for sustaining an award under the LHWCA as it was then written.[24] Even if the presumption that Congress understands the legal context in which it legislates justifies

___

[23] The "status" provision replaced the "unless recovery may validly be provided by state law" language that was being construed in *Parker* and *Calbeck*.

[24] In 1942, as it does today, the LHWCA expressly excluded coverage of injuries to members of the crew of any vessel and to persons who load or unload small boats. See n. 5, *supra*. Thus, a janitor could not recover on the theory that he was a member of the crew of the motorboat, or that he helped to load or unload the motorboat. It is difficult to explain the narrow category of workmen associated with motorboat operations for whom *Parker* expressed concern or for whom the Court preserves coverage today.

the inference that it remembered this isolated case decided three decades earlier, it by no means follows that Congress had a duty to disavow the case explicitly in order to give effect to its otherwise plainly expressed purpose.[25]

This case presents us with a straightforward problem of statutory construction. The Court should begin its analysis with the language of the statute itself. "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 108 (1980). In this case the statutory language plainly encompasses longshoremen and harbor workers; there is no affirmative evidence of a legislative intent to provide coverage for any other type of occupation. Surely there is no evidence of an intent to classify the work of a janitor or a builder of sewage treatment plants as "maritime employment."[26]

---

[25] The Court cites three cases from the Federal District Courts, three from the Courts of Appeals, and one from a state appellate court in which workers who were not longshoremen or harbor workers were stated to have been covered by the LHWCA before 1972. *Ante,* at 312, n. 21. It uses these cases to support its argument that it would have been a radical and unsettling change for the 1972 Congress to limit post-1972 coverage to people who perform the work of longshoremen and harbor workers. I would draw a somewhat different inference. It is hard to believe that Congress had in mind such a light sprinkling of cases during the 45-year interval between 1927 and 1972 when it spoke of the traditional coverage of the Act, especially given Congressman Daniels' reminder that in 1970 there were 68,000 injuries to longshoremen. See *supra,* at 332.

[26] I note some tension among different components of the Court's opinion with regard to whether the janitor in *Parker* would be covered after 1972. On the one hand, the Court states:

"[B]efore 1972 . . . *any* worker injured upon navigable waters in the course of employment was 'covered . . . without any inquiry into what he was doing (or supposed to be doing) at the time of his injury. . . .'" *Ante,* at 311. "We are unable to find any congressional intent to withdraw coverage of the LHWCA from those workers injured on navigable waters in the course of their employment, and who would have been covered by the Act before 1972." *Ante,* at 315. "Congress . . . assumed that injuries occurring on

Because the claimant in this case was neither a longshoreman nor a harbor worker, I would affirm the judgment of the United States Court of Appeals for the Second Circuit.

---

the actual navigable waters were covered, and would remain covered." *Ante*, at 319.

On the other hand, it concludes:

"Our holding, of course, extends only to those persons 'traditionally covered' before the 1972 Amendments. We express no opinion whether such coverage extends to a worker injured while transiently or fortuitously upon actual navigable waters . . . . Our decision today should not be read as exempting water-based workers from the new status test. Rather, our holding is simply a recognition that a worker's performance of his duties upon actual navigable waters is necessarily a very important factor . . . ." *Ante*, at 324, n. 34.

Similarly, at one point the Court says "[Congress'] use of 'employees traditionally covered' was intended to refer to those employees included in the scope of coverage under *Parker, Davis*, and *Calbeck*," *ante* at 319–320, but at another point it concedes that those very cases were read "not to limit LHWCA coverage only to 'traditional' maritime activities," *ante*, at 312, n. 21.

I agree with the Court that the post-1972 Act provides coverage for "traditional" maritime activities. However, as I have indicated *supra*, at 328–335, Congress understood such activities to be those of longshoremen and harbor workers, not janitors and construction workers.