Filed 9/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BRIAN RANGER, | B315302 |
| Plaintiff and Appellant, | Los Angeles County |
| v. | Super. Ct. No. 19STCV22806 |
| ALAMITOS BAY YACHT CLUB, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge. Affirmed.

Krissman & Silver LLP, Jarod Krissman and Kathie Sierra for Plaintiff and Appellant.

Cox, Wootton, Lerner, Griffin & Hansen, LLP, Neil S. Lerner and Mitchell S. Griffin for Defendant and Respondent.

_____

Brian Ranger fell while stepping from a dock to a boat. He sued his employer—a yacht club in Long Beach—under federal admiralty law. The state trial court correctly sustained the club's

demurrer.  Congress's 1984 legislation remitted Ranger to the exclusivity of workers' compensation.

The Alamitos Bay Yacht Club hired Ranger as a maintenance worker.  He helped the club with its fleet by painting, cleaning, maintaining, repairing, unloading, and mooring vessels.  One day, Ranger used a hoist to lower a club boat into navigable waters.  He stepped from the dock onto its bow, fell, was hurt, and applied for workers' compensation.  Then he sued the club in state court on federal claims of negligence and unseaworthiness.  The trial court sustained the club's final demurrer to the second amended complaint.  The court ruled there was no admiralty jurisdiction.

We independently review pleading challenges.

We affirm the court's ruling without deciding about admiralty jurisdiction.  That issue is supernumerary, for state court jurisdiction is assured in every event, and irrelevant given our holding.  (See *Madruga v. Superior Court* (1954) 346 U.S. 556, 560–561 [state courts may adjudicate in personam maritime claims]; *Gault v. Mod. Cont'l/Roadway Constr. Co., Joint Venture* (2002) 100 Cal.App.4th 991, 997 [state and federal courts have concurrent jurisdiction in Jones Act, Longshore Act, and general maritime law cases].)

To summarize our analysis, Congress in 1984 specified employees covered by state workers' compensation law working at a "club" are covered by state workers' compensation law and not federal law if they are eligible for state workers' compensation.  (33 U.S.C. § 902, subds. 3, 3(B).)  Ranger concedes the yacht club is a "club."  Federal law thus makes California state workers' compensation law paramount, which means

Ranger's exclusive remedy is workers' compensation. (Labor Code, § 3602, subd. (a) [workers' compensation is exclusive].)

To set out our analysis in more detail, we begin by defining admiralty law. The Constitution implicitly directed courts sitting in admiralty to proceed as common law courts. Where Congress has not prescribed specific rules, these courts developed an amalgam of traditional, modified, and new common law rules. That amalgam is the general maritime law, which is no longer the exclusive province of federal judges. Congress and the states legislate extensively in these areas. When exercising their common law authority, *admiralty courts look primarily to legislative enactments for policy guidance.* (*Dutra Group v. Batterton* (2019) 139 S.Ct. 2275, 2278 (*Batterton*).)

That last point is vital. "In contemporary maritime law, our overriding objective is to pursue the policy expressed in *congressional enactments . . . .*" (*Batterton, supra,* 139 S.Ct. at pp. 2285–2286, italics added.)

A *congressional enactment* does guide our decision. Congress enacted the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927 (Longshore Act), which established a workers' compensation program for "any person engaged in maritime employment." (See *Swanson v. Marra Brothers* (1946) 328 U.S. 1, 5–6; 33 U.S.C. §§ 902, 905.)

Congress amended the Longshore Act in 1972 and again in 1984. The 1972 amendments extended the coverage of the Longshore Act but created uncertainty about the boundaries of that extension. (E.g., *Director v. Perini North River Associates* (1983) 459 U.S. 297, 305–325 (*Perini*).)

Congress later learned the 1972 law had created "a general confusion as to whether or not the Longshore Act applies." (Sen.Rep. No. 98-81, 1st. Sess., p. 29 (1983) (Sen.Rep. 98-81).)

"[T]he decade of experience under the 1972 Amendments has vividly demonstrated that the effort to eliminate benefit disparity and to promote systemic uniformity has exacted a price . . . . The rules of coverage . . . have been a . . . prolific generator of litigation. . . . ¶ This situation presents an unsatisfactory state of affairs. Uncertainty of coverage fosters continued litigation, with attendant expense and delay that is a burden to employers, their insurance carriers, and claimants. Further, it was repeatedly voiced at the hearings that employers were often unsure whether to obtain [Longshore Act] insurance coverage. Even when they opted for such insurance, they generally found that the premiums were inordinately expensive. Or, in many instances, employers were unable to buy insurance coverage, because the insurance companies did not want to be faced with vagaries of coverage." (Sen.Rep. 98-81, *supra*, pp. 24–25, internal quotation marks and footnotes omitted.)

In 1984, Congress responded by introducing a degree of clarity: Congress sharpened the Longshore Act's focus to exclude employees who, although they happened to work on or next to navigable waters, *lacked a sufficient nexus to maritime navigation and commerce*. In response to the experiences of many witnesses, Congress adopted what it called a "case-specific approach." (Sen.Rep. 98-81, *supra*, at p. 25.) Congress determined certain categories of activities identified by witnesses did not merit coverage under the Longshore Act and "the employees involved *are more aptly covered under appropriate state compensation laws*." (*Ibid.*, italics added.)

4

The 1984 statute thus carved out specific employee categories, placed them beyond the coverage of the Longshore Act, and assigned these employees to the "appropriate state compensation laws." (Sen.Rep. 98-81, *supra*, at p. 25.)

Among the carveouts were employees working for *clubs*. (Sen.Rep. 98-81, *supra*, at pp. 25–26.)

Which clubs? *All* clubs. Initially there was disagreement between the Senate and the House of Representatives about whether the Longshore Act should exclude only employees working at *nonprofit* clubs. (H.R.Rep. No. 98-570, 1st Sess., p. 4 (1983) (H.R.Rep. 98-570).) The Senate wanted a broader approach but the House initially favored the narrower one. The Senate's view prevailed: the exclusion applies to all club employees and is not limited to nonprofits. (H.R.Rep. No. 98-1027, 2d Sess., p. 23 (1983) (H.R.Rep. 98-1027).)

We now quote the textual result: the pertinent provision—subsection three of section 902 of the Longshore Act—as it stands after the 1984 amendments. Our italics highlight key words.

"The term 'employee' means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, . . . *but such term does not includ*e—

"(A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work;

"(B) *individuals employed by a club*, camp, recreational operation, restaurant, museum, or retail outlet;

"(C) individuals employed by a marina and who are not engaged in construction, replacement, or expansion of such marina (except for routine maintenance);

"(D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this Act;

"(E) aquaculture workers;

"(F) individuals employed to build any recreational vessel under sixty-five feet in length . . . ;

"(G) a master or member of a crew of any vessel; or

"(H) any person engaged by a master to load or unload or repair any small vessel under eighteen tons net;

"*if individuals described in clauses (A) through (F) are subject to coverage under a State workers' compensation law.*" (33 U.S.C. § 902, subd. (3), italics added.)

Paring this statute to its relevant essence shows the Longshore Act does not cover club employees subject to state workers' compensation coverage. (33 U.S.C. § 902, subd. (3)(B).) Congress determined in 1984 club employees "*are more aptly covered under appropriate state compensation laws*" because these employees lack "*a sufficient nexus to maritime navigation and commerce.*" (Sen.Rep. 98-81, *supra*, at p. 25, italics added.) Under California's workers' compensation law, employees may not sue their employers in tort. (See Labor Code §§ 3351, 3600, subd. (a).)

This analysis of statutory language and history demonstrates Ranger cannot sue his employer in tort. The trial court correctly sustained the demurrer against Ranger.

This result makes good sense. Ranger asserts federal law preempts state law in this case, but national and state interests do not clash here. Federal and state law are in accord. For

6

employees like Ranger, both Congress and the California legislature have replaced the fault-based regime of tort with the no-fault alternative of workers' compensation. Both bodies have preferred the virtues of speedy, predictable, and efficient compensation for occupational accident victims like Ranger. The "underlying philosophy [is] social protection rather than righting a wrong." (1 Larson, Workers' Compensation Law (2023) chapter 1, syn.) The Longshore Act, its 1984 amendments, and California workers' compensation law all share this philosophy. This federalism is harmonious, not discordant. (Cf. *Sprietsma v. Mercury Marine* (2002) 537 U.S. 51, 70 [a federal concern with uniformity does not justify displacing state law remedies that compensate accident victims and also serve prominent federal objectives].)

Ranger counters this analysis by repeatedly stressing the importance of "uniformity" of the general maritime law. In this quest, Ranger relies on *Green v. Vermilion Corp.* (5th Cir. 1998) 144 F.3d 332, 334–341 (*Green*).

We respectfully but profoundly differ with *Green.* We therefore also part ways with *Freeze v. Lost Isle Partners* (2002) 96 Cal.App.4th 45, 51-52 (*Freeze*), which relied on *Green* without adding to its analysis.

We begin with *Green*'s facts. Sam Green worked as a cook and watchman at a Louisiana duck hunting camp. He traveled by boat to the camp, which was in a marshy area. Green also assisted with mooring and unloading supply boats at the camp. Green boarded a boat, slipped, fell, and was hurt. He sued his employer, the Vermilion Corporation, under the Longshore Act and for general maritime claims of negligence and unseaworthiness. The trial court granted the defense motion for

summary judgment. The Fifth Circuit reversed and permitted Green to prosecute his maritime claims for unseaworthiness and negligence. This appellate decision preempted the state law. (*Green*, *supra*, 144 F.3d at pp. 333–341.)

*Green* has encountered a mixed reception. Some later courts apply it. (E.g., *Moore v. Capital Finishes, Inc.* (2010) 699 F.Supp.2d 772, 780–783.) Others reject it. (E.g., *Valcan v. Harvey's Casino* (S.D.Iowa 2000) 2000 WL 33673727, p. *1.)

In particular, we join with the contrary result in *Brockington v. Certified Electric, Inc.* (11th Cir. 1990) 903 F.2d 1523, 1527–1533 (*Brockington*). *Green* criticized *Brockington*. (*Green*, *supra*, 144 F.3d at pp. 336–341.) A respected maritime treatise praised *Brockington* as "an excellent example of admiralty preemption analysis." (1 Schoenbaum, Admiralty and Maritime Law (6th ed. 2022 supp) § 4:5, Preemption in admiralty, fn. 12.) *Brockington* balanced the comparative federal and state interests to conclude admiralty law did not preempt a state workers' compensation statute. (*Brockington, supra*, 903 F.2d at pp. 1529–1533.) We submit *Brockington*'s result is valid and *Green*'s is not.

Like Ranger, the *Green* court emphasized "uniformity." The *Green* opinion used this word six times. (*Green*, *supra*, 144 F.3d at pp. 337, 341.) And like Ranger, the *Green* opinion conceived of "uniformity" as meaning that national power, *as defined by judges*, must displace the works of state legislatures.

We reject *Green*'s and Ranger's conception of uniformity, which lacks the ability logically to discriminate. This kind of uniformity is a one-way street, not a useful method of analysis: it always insists on national uniformity, regardless of context, and it always disfavors state power, which can be sound and richly

8

diverse.  (Cf. *Exxon Corp. v. Chick Kam Choo* (5th Cir.1987) 817 F.2d 307, 317–18, rev'd on other grounds, (1988) 486 U.S. 140 [uniformity is not an end in itself, for otherwise state law would always be preempted].)

*Green*'s approach clashes with our deep national strain of federalism that celebrates states as laboratories of experimentation.  (E.g., *National Pork Producers Council v. Ross* (2023) 143 S.Ct. 1142, 1160 [citing *New State Ice Co. v. Liebmann* (1932) 285 U.S. 262, 311 (dis. opn. of Brandeis, J.)]; *Fisher v. University of Texas* (2016) 579 U.S. 365, 388 [same].)

*Green*'s notion of uniformity also collides with the kind of uniformity praised in modern Supreme Court admiralty decisions like *Batterton*, where the "uniformity" sought is with policies enacted by democratically-elected representatives.  (See *Batterton*, *supra*, 139 S.Ct. at p. 2284.)  This kind of uniformity is sensible, as it seeks to anchor the law of admiralty in the legitimacy of the electoral process.

To be sure, *Green*'s and Ranger's conception of "uniformity" has antique support, but age has rotted some of those old timbers.  *Green* sought guidance from many Supreme Court decisions around the *Lochner* era.  (*Green*, *supra*, 144 F.3d at pp. 339–340 [citing over a dozen opinions dating from 1916 to 1936].)  From this survey *Green* concluded "the constant theme of these Supreme Court opinions is that the *uniformity* of admiralty law must be preserved and that state law may be applied only where it works no material prejudice to the essential features of the general maritime law." (*Green*, *supra*, 144 F.3d at pp. 340–341, italics added and internal quotation marks omitted.)

These *Lochner*-era decisions lack modern force.  Their exemplar is *Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205

9

(*Jensen*), an infamous 5-4 holding in favor of a steamship owner against a worker who was killed unloading that ship.  The state of New York awarded state workers' compensation to Jensen's widow and children.  The railroad protested these awards were unconstitutional.  (*Id.* at pp. 209–210.)  The *Jensen* majority agreed and struck New York's law as unconstitutional.  (*Id.* at pp. 217–218.)

The *Jensen* decision is infamous by virtue of Holmes's "celebrated" dissent.  (Gilmore & Black, The Law of Admiralty (2d ed. 1975) p. 406.)  Holmes wrote that the "*common law is not a brooding omnipresence in the sky*, but the articulate voice of some sovereign or quasi sovereign that can be identified . . . ." (*Jensen*, *supra*, 244 U.S. at p. 222, italics added.)  Holmes dismissed "the specter of a lack of uniformity." (*Id.* at p. 223.) Instead, he posed the crucial question and gave the crucial answer:  "Taking it as established that a state has constitutional power to pass laws giving rights and imposing liabilities for acts done upon the high seas when there were no such rights or liabilities before, what is there to hinder its doing so in the case of a maritime tort?  Not the existence of an inconsistent law emanating from a superior source, that is, from the United States.  *There is no such law*." (*Id.* at p. 220, italics added.) Holmes acknowledged the common law power of judges but accused the majority of exceeding that power:  "I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions." (*Id.* at p. 221.)

The *Jensen* majority resorted to more than molecular judicial motion.  It engaged in wholesale judicial arrogation, as the dissenting Holmes demonstrated in this and other cases of

10

the era.  (E.g., *Lochner v. New York* (1905) 198 U.S. 45, 75 (dis. opn. of Holmes, J.) ["This case is decided upon an economic theory which a large part of the country does not entertain"]; *Knickerbocker Ice Co. v. Stewart* (1920) 253 U.S. 149, 166-170 (dis. opn. of Holmes, J.).)  As elsewhere, Holmes's dissents are a better guide to modern law than the *Lochner*-era majority opinions that sparked them.  (E.g., *Abrams v. United States* (1919) 250 U.S. 616, 624-631 (dis. opn. of Holmes, J.) [proposing the clear-and-present-danger test for the First Amendment]; *Adkins v. Children's Hospital* (1923) 261 U.S. 525, 567–570 (dis. opn. of Holmes, J.) ["The question in this case is the broad one, whether Congress can establish minimum rates of wages for women"].)

Another *Lochner*-era decision *Green* cited is *Robins Dry Dock & Repair Co. v. Dahl* (1925) 266 U.S. 449, 457 (*Dahl*).  (See *Green*, *supra*, 144 F.3d at p. 339.)  In *Dahl*, the Supreme Court barred states from enlarging or impairing rights and remedies arising from general maritime law.  "However, *Dahl* was decided in 1925, when the Supreme Court's concept of tort jurisdiction did not permit state law to apply seaward beyond the ship's gangplank, a border known as the *Jensen* line. . . .  This limited view of state jurisdiction was discredited almost as soon as it was established, but nevertheless spawned many complex, contradictory and inconsistent decisions that have been described as one of the most depressing branches of federal jurisprudence.  Given the developments in admiralty jurisdiction over the past 80 years, *Dahl* is no longer reliable precedent.  As the Supreme Court itself stated . . . , the decisions between 1917 and 1926 produced no reliable determinant of valid state law coverage."

11

(*Gravatt v. City of New York* (S.D.N.Y. 1998) 1998 WL 171491, p. *11, internal quotation marks and citations omitted.)

*Green*'s mistaken conception of "uniformity" is reason enough to depart from it, but other flaws also corrode its appeal.

*Green* failed to grapple with the governing statute: the 1984 amendments to the Longshore Act. *Green* cited those amendments but did not appreciate their significance. (See *Green*, *supra*, 144 F.3d at pp. 334-335.) To recap, the 1984 amendments excluded camp (and club) employees from the Longshore Act's workers' compensation system and relegated them to coverage under state workers' compensation laws, which are exclusive of tort. (33 U.S.C. § 902, subd. (3).) *Green* did not consider this directive from Congress.

Nor did *Green* mention the statements in the 1984 legislative history that club and camp workers like Green "*are more aptly covered under appropriate state compensation laws*." (E.g., Sen.Rep. 98-81, *supra*, at p. 25, italics added.) That appropriate Louisiana state law directed that workers' compensation was exclusive. (See *Green*, *supra*, 144 F.3d at pp. 337, 338.) This authoritative legislative history contradicted *Green*'s conclusion.

*Green* also relied, incorrectly, on legislative history pertaining to the *1972* amendments, not the 1984 amendments. (*Green*, *supra*, 144 F.3d at p. 338 [quoting "H.R.Doc. 92–1441, 92th Cong., 2nd Sess. *1972* U.S.C.C.A.N. 4698, 4707," italics added].) The proper guides to the 1984 amendments are the 1984 Senate and conference reports. The 1972 amendments were the problem, not the solution.

Apart from *Green* and *Freeze*, Ranger cites cases predating 1984. These authorities deal with old superseded law, not the

new governing law.  (E.g., *Perini, supra*, 459 U.S. at pp. 305–325; *Foremost Insurance Co. v. Richardson* (1982) 457 U.S. 668; *Seas Shipping Co. v. Sieracki* (1946) 328 U.S. 85; *Davis v. Dept. of Labor and Industries of Washington* (1942) 317 U.S. 249; *Calbeck v. Travelers Insurance Co.* (1962) 370 U.S. 114; *Aparicio v. Swan Lake* (5th Cir. 1981) 643 F.2d 1109, 1113–1118; *Thibodaux v. Atlantic Richfield Co.* (5th Cir. 1978) 580 F.2d 841, 843–848; *Hamilton v. County of Los Angeles* (1982) 131 Cal.App.3d 982, 996–997.)

In sum, California's workers' compensation law is Ranger's exclusive remedy.  Congress in 1984 decreed this state law aptly covers his situation.  A core part of the state workers' compensation bargain is that injured workers get speedy and predictable relief irrespective of fault.  In return, workers are barred from suing their employers in tort.  The trial court correctly dismissed Ranger's tort suit against his employer.

## DISPOSITION

We affirm and award costs to the respondent.


WILEY, J.


We concur:


STRATTON, P. J.


GRIMES, J.


13